Daniel J. VITALO; Diane E. Vitalo, h/w, Appellants

v.

CABOT CORPORATION, Individually and as Successor in Interest to Cabot Berylco, Inc., Kawecki Berylco Inc., a/k/a KBI Kawecki Berylco Industries, Inc., The Beryllium Corporation, c/o C.T. Corporation System, NGK Metals Corporation, Individually and as Successor to the Beryllium Corporation, Kawecki Berylco Inc., a/k/a KBI, Kawecki Chemical Co., Berylco, Inc., c/o C.T. Corporation System, NGK Insulators, Ltd., c/o C.T. Corporation System, NGK North America, c/o C.T. Corporation System.

No. 03–1741.

United States Court of Appeals, Third Circuit.

Argued June 25, 2004.

Opinion Filed March 3, 2005.

---

Ruben Honik, (Argued), Golomb, Honik & Langer, Philadelphia, PA, for Appellant.

Neil S. Witkes, (Argued), Sandra G. Gibbs, Manko, Gold, Katcher & Fox, Bala Cynwyd, PA, James W. Gicking, (Argued), Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Appellee.

Before AMBRO, BECKER and GREENBERG, Circuit Judges.

OPINION OF THE COURT

AMBRO, Circuit Judge.

This case requires us to revisit the question of when Pennsylvania's statute of limitations begins to run in a personal injury action alleging harm traceable to defendants' beryllium plant in Reading, Pennsylvania. Our Court examined four similar cases in *Debiec v. Cabot Corporation,* 352 F.3d 117 (3d Cir.2003).[1] The law applied is well understood—the statute of limitations begins to run when a person knows, or through the exercise of reasonable diligence should know, s/he has been injured and someone else caused that injury. A complication arises when the injury caused is a disease that develops over time. In those cases, when should a plaintiff know s/he needs to investigate and bring potential claims? Answers are discerned under the so-called "discovery rule," the touchstone of which is reason-

---

1. By happenstance two of the three panel members in *Debiec* sit on this case as well.

able diligence by the plaintiff. In this case we hold that the statute of limitations began to run when Plaintiff Daniel Vitalo ceased to exercise reasonable diligence in investigating his health problems, more than two years before he and his wife, Diane, brought suit. Thus their claims do not escape the bar of Pennsylvania's two-year limitations period.

## I. Factual Background

Defendants Cabot Corporation and NGK Metals Corporation operate a beryllium manufacturing plant in Reading, Pennsylvania ("the Reading Plant"). Beryllium, with many industrial uses, unfortunately is a toxic substance that can cause both cancer and a lung disorder known as chronic beryllium disease ("CBD").

For his entire life Daniel Vitalo ("Vitalo" or "Daniel"), now in his mid-'70s, has lived within six miles of the Reading Plant. He suffers from CBD, resulting from exposure to respirable beryllium dust emanating from the Reading Plant.

For four months in 1959 Vitalo worked in the furnace room of the Reading Plant. This period of employment ended when he began experiencing respiratory troubles— shortness of breath and chronic coughing. According to Vitalo, he was sent home by the plant physician on the basis of the doctor's diagnosis that Vitalo was suffering from "beryllium poisoning," also known as berylliosis. Vitalo never returned to his job at the Reading Plant. For the next three decades, until his retirement in 1990, Vitalo worked for a railroad company-Reading Company (which later became part of Conrail).

By June of 1995 the United States Department of Health and Human Services ("HHS") had completed a workplace study of persons who worked in beryllium production plants, focusing on the increased risk of lung cancer created by workplace beryllium exposure. That month HHS sent Vitalo information about the completed study, including a letter that stated: "Before this study began, we knew that people exposed to beryllium may develop ... acute and chronic ... lung diseases caused by exposure to beryllium." The letter further stated that "[c]hronic beryllium disease and lung cancer may develop many years after the last exposure to beryllium. Thus, you and your doctor should be aware that you might have an increased risk of developing these diseases." The packet also contained a fact sheet describing the main symptoms of chronic beryllium disease, including "shortness of breath ..., cough, fatigue, weight loss, or chest pains." HHS urged that should the recipient of the information packet develop these symptoms, s/he should seek medical attention and provide the enclosed fact sheet—entitled "For Your Doctor"—to her/his physician. HHS provided additional information along with the letter, including a fact sheet with the header "Steps to Protect Your Health." Vitalo testified at deposition that he did not remember receiving this packet from HHS.

In 1996 Vitalo developed a cough that led him to see his family physician, Dr. Ivan Bub. In December of that year, Dr. Bub ordered a chest x-ray that showed "[s]ome chronic obstructive pulmonary disease." Dr. Bub informed Vitalo of these findings and ordered a second x-ray, which was conducted on January 9, 1997. The radiology report of this second chest x-ray observes: "There is somewhat increased interstitial lung markings due to chronic process."

A week later, Vitalo received a letter from Moody, Strople & Kloeppel, Ltd., a Virginia law firm pursuing asbestos litigation on behalf of plaintiffs. The letter encouraged Vitalo to undergo a chest x-ray in order to screen him for asbestos-caused

lung diseases that he might have contracted while working for the railroad. In response to this letter, Vitalo underwent yet another chest x-ray in June 1997. This x-ray was reviewed by Dr. Dominic Gaziano on behalf of the Moody firm. Dr. Gaziano concluded that "there is evidence of an occupational lung disease." He saw a "vague shadow" on Vitalo's upper right lobe that "may represent old scarring, an active disease process or possibly even a tumor." Dr. Gaziano recommended that Vitalo consult his treating physician as soon as possible to discuss the report.

Vitalo returned to Dr. Bub in early August 1997, presenting both Dr. Gaziano's report and the June 1997 x-ray films. During this consultation, Vitalo complained that he had been coughing up mucus for the past seven to ten days and explained that "he had worked around asbestos in the remote past, also around beryllium." According to Dr. Bub, he and Vitalo discussed the possibility that Vitalo was suffering from occupational lung disease. As a result of this consultation, Dr. Bub referred Vitalo to Dr. Joseph Mariglio, a pulmonary specialist.

Vitalo met with Dr. Mariglio shortly thereafter, noting his concern about the June 1997 x-ray and the possible lung mass it disclosed. At the time, Vitalo was asymptomatic. Dr. Mariglio performed several tests, including a CAT scan of the chest and a pulmonary function study. His notes recorded Vitalo's diagnosis with berylliosis when he worked at the Reading Plant in 1959. In a letter to Dr. Bub, Dr. Mariglio reported that, though he doubted Vitalo had a lung mass, he diagnosed him with "[p]robable occupational Lung Disease[,] i[.]e., berylliosis [;] doubt asbestosis."

Dr. Mariglio testified at his deposition that in September 1997 he discussed these conclusions with Vitalo, explained that Vitalo had "[o]ccupational-related lung disease," and informed Vitalo that "there was some scarring in the lungs" believed to be "industry-related." When Vitalo was questioned at his deposition about this conversation with Dr. Mariglio, the following exchange occurred:

Q. When [Dr. Mariglio] said you had some scarring in the lungs, and ... he thought it was industry-related, did he explain what he meant by that?

A. No, sir, he did not.

Q. Did you ask him for any information on that, what he meant by it or why he thought that?

A. No, sir.

Q. What industry was he talking about?

A. I—he didn't say. He just said it was industry-related.

Q. At that time, when he told you it was industry-related, did he mention your work with the railroad and any asbestos exposure?

A. No, he did not.

Q. Did he mention work at the Beryllium Corporation and any beryllium exposure?

A. No, he did not.

Q. What happened after you saw Dr. Mariglio and he told you that, that it was industry-related and you had scarring on your lungs?

A. Nothing.

Q. Did you ever see him again?

A. No.

Vitalo maintains that neither Dr. Mariglio nor Dr. Bub ever told him that his lung condition was caused by beryllium. Because Vitalo was asymptomatic at the time of his visit, Dr. Mariglio did not recommend that he obtain further testing.

In August 1998 Dr. Kenneth Rosenman of Michigan State University sent Vitalo a

packet of information soliciting his participation in a beryllium worker study of the National Institute for Occupational Safety and Health ("NIOSH"). Dr. Rosenman's cover letter explained: "Our records show that at some time in your life, you worked at a beryllium production facility in Reading, Pennsylvania. Some workers from these plants have been exposed to beryllium, a substance that can cause lung disease." The letter offered Vitalo free medical testing to determine whether he was suffering from any beryllium-related lung condition, providing instructions as to which forms to fill out and return in order to participate in the study and receive the free medical screening. The packet of information also included a fact sheet about beryllium and CBD which listed the major health problems that beryllium can cause and CBD's symptoms. Vitalo claims he does not remember receiving this packet from Dr. Rosenman, yet he does not refute the evidence presented that he signed and returned the enclosed medical records release forms in August and October 1998 and the beryllium screening consent form in October.

In early December 1998 Vitalo was once again examined for possible signs of asbestosis at the request of the Moody law firm. Dr. Alvin Schonfeld sent a report of this examination directly to the firm. In the report, he concluded that "[g]iven [Vitalo]'s history of significant exposure to aerosolized asbestos associated with an appropriate latency and given the roentgenographic and pulmonary functions findings described above, I feel with a reasonable degree of medical certainty that Mr. Vitalo is diagnosed as having interstitial fibrosis caused by pulmonary asbestosis." The report included no reference to any occupational or other exposure to beryllium, but it did discuss Vitalo's history of work for the Reading Company. The report stated that Vitalo had complained of shortness of breath after climbing stairs, wheezing and coughing up yellow mucus. Dr. Schonfeld noted that he had advised Vitalo "to seek medical follow up for" these symptoms. There is no evidence in the record that Vitalo sought further medical care as a result. In any event, Vitalo thereafter became a class member in an asbestos lawsuit brought by the Moody firm against various asbestos companies.

In late May 1999 Dr. Rosenman sent a letter to Vitalo detailing the results of his medical testing as follows:

> Your blood test was normal. Your blood did not react to beryllium. Your breathing test was abnormal. Your x-ray showed scarring in your lung which may be caused by beryllium. [B]ecause of the scarring in your lung, *we would recommend you have further testing to determine if you have chronic beryllium disease.* We are offering this testing at the University of Pennsylvania in Philadelphia. There is no charge to you for the testing.... Milton Rossman, M.D., a lung specialist at the University of Pennsylvania, will be performing the testing. He will be calling you in the next couple of weeks to discuss the testing with you.

(Emphasis added.) Vitalo was also advised that transportation costs to and from Philadelphia and a room at a local hotel for a companion would be provided. Dr. Rossman's research coordinator, Joaquina Regovich, sent a follow-up letter to encourage Vitalo to undergo the additional testing. She explained that it was her usual practice to follow up further with a telephone call. Vitalo did not respond to these requests for additional testing.

Dr. Rosenman sent out two follow-up letters—the first in November 2000 and the second in June 2001—to encourage certain participants in the NIOSH study to

undergo additional testing at the University of Pennsylvania. These letters informed participants of a federal compensation fund that would provide medical care costs and a $150,000 payment to qualifying individuals with beryllium disease.

Vitalo spoke with Dr. Rosenman's office in December 2000 to schedule the follow-up testing with Dr. Rossman at Penn. Vitalo underwent this additional testing in January 2001 and was diagnosed that same month with CBD.

The Vitalos filed this action on December 20, 2001. Daniel asserted claims of negligence, strict liability for abnormally dangerous activity, strict liability for ultra-hazardous activity, fraudulent concealment or nondisclosure, and civil conspiracy. Diane asserted a derivative claim for loss of consortium.

Cabot Corporation and NGK Metals Corporation moved for summary · judgment, arguing that all of the Vitalos' claims are barred by the two-year Pennsylvania statute of limitations. The Vitalos argued that they did not discover the cause of Daniel's disease until the definitive diagnosis of CBD in January 2001. The District Court, however, believed that, based on the uncontested facts, the Vitalos' complaint fell outside the statute of limitations and thus entered summary judgment against them. This appeal follows.[2]

## II. Standard of Review

"We exercise plenary review over a district court's grant of summary judgment and apply the same standard as the district court; i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs." *Debiec,* 352 F.3d at 128 n. 3 (citing Fed. R. Civ. P. 56(c); *McNulty v.*

*Citadel Broad. Co.,* 58 Fed.Appx. 556 (3d Cir.2003)). We are required to view the record and draw inferences in the light most favorable to the non-moving party, *id.,* yet the non-moving party must produce admissible evidence containing "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Pamintuan v. Nanticoke Mem'l Hosp.,* 192 F.3d 378, 387 n. 13 (3d Cir.1999); *Wetzel v. Tucker,* 139 F.3d 380, 383 n. 2 (3d Cir.1998).

## III. Applicable Law

 Our opinion in *Debiec* described the applicable Pennsylvania state law at issue here, namely, Pennsylvania's two-year statute of limitations for personal injury and wrongful death actions, 42 Pa. Cons.Stat. § 5524(2), and its associated "discovery rule," which delays the running of the limitations period when "a party, through no fault of his or her own, does not discover her injury until after the statute of limitations normally would have run." 352 F.3d at 129. In a typical case, a person is injured and suspects a cause. That person has two years to sue after the injury. If, however, an injury is undiscovered (that is, it is hidden and therefore unknown or latent), the time within which to sue does not begin to run until the plaintiff first knows, or reasonably should know, that s/he has been injured and that her/his injury has been caused by another party's conduct. *Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir.1991) (citing *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 471 A.2d 493, 500 (1984)). We have construed this objective reasonableness requirement to mean that the statute of limitations begins to run when plaintiffs come to possess "sufficient critical facts to put [them] on notice that a wrong has been

2. The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1332. Our

Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

committed and that [they] need to investigate to determine whether [they are] entitled to redress." *Zeleznik v. United States*, 770 F.2d 20, 23 (3d Cir.1985).

 A plaintiff seeking the shelter of the discovery rule bears "a duty to exercise 'reasonable diligence' in ascertaining the existence of the injury and its cause." *Bohus*, 950 F.2d at 925. What does reasonable diligence require? It requires that putative plaintiffs "exhibit[] those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Cochran v. GAF Corp.*, 542 Pa. 210, 666 A.2d 245, 249 (1995). Proof of a plaintiff's subjective knowledge is insufficient to invoke the discovery rule; a defendant can inquire what a reasonable plaintiff should know or should know to check. *See id.* (explaining that reasonable diligence is an objective, rather than a subjective, standard). Put simply, clues indicating to a reasonable person an injury or its cause cannot be ignored.

 If a person knows of an injury but is given an incorrect, but nevertheless reasonable, diagnosis, that person may be misdirected as to the injury's cause. In that case, the statute of limitations might not begin to run until the injured person is given a correct diagnosis or should otherwise know the true cause (in light of the totality of the circumstances). *Debiec*, 352 F.3d at 132. This special case is evaluated under the same, general rubric. In light of the incorrect diagnosis, we inquire whether a reasonable person should have known the true cause of her/his injury and whether that person exercised reasonable diligence.

 Plaintiffs seeking the benefit of the discovery rule bear the burden of establishing its applicability. *Dalrymple v.*

*Brown*, 549 Pa. 217, 701 A.2d 164, 167 (1997) (as to the injury); *Cochran*, 666 A.2d at 250 (as to the cause of the injury). In *Debiec*, we explained that, while "the question whether a plaintiff has exercised reasonable diligence is usually a jury question[,] ... [t]he Pennsylvania Supreme Court has cautioned ... that where the facts are so clear that reasonable minds cannot differ, the commencement period may be determined as a matter of law." *Debiec*, 352 F.3d at 129 (quotation marks and citation omitted).

## IV. Analysis

 do not believe, as a matter of law, that Vitalo pursued the cause of his injury with reasonable diligence through December 1999. We agree with the District Court that "[g]iving plaintiffs the benefit of all doubt, the time for commencing this action began to run at the latest in May, 1999." *Vitalo v. Cabot Corp.*, 2003 WL 22999240, *8 (E.D.Pa. Feb. 25, 2003). The Vitalos did not file their lawsuit until December 20, 2001–at least seven months after Pennsylvania's two-year statute of limitations had run. For this reason, we affirm the District Court's order granting the defendants summary judgment.

By May 1999 Vitalo was aware of sufficient critical facts to put him on notice that he had been injured and that he needed to investigate his health problem and its cause. To begin, Vitalo had direct experience with beryllium toxicity in 1959. Admittedly, as he points out, acute beryllium poisoning is distinct from chronic beryllium disease, and approximately thirty years time separates his acute beryllium toxicity episode from the later onset of CBD symptoms. Yet Vitalo's early experience with beryllium toxicity is nonetheless relevant. Certainly he must have (or should have) reflected on his 1959 experience with beryllium in the many conversa-

tions he had with various doctors in which potential "occupational lung disease" was discussed. Indeed there is evidence to suggest that Vitalo did consider the 1959 episode in the context of his later health problems. Dr. Mariglio, for example, was made aware of the 1959 episode when he evaluated Vitalo in August of 1997, ulti-. mately diagnosing Vitalo with "[p]robable occupational Lung Disease i[.]e., berylliosis [;] doubt asbestosis."

Vitalo received unsolicited literature informing him of the health risks posed by his exposure to beryllium and encouraging him to investigate diligently this possibility. Because Vitalo does not remember receiving the HHS information packet purportedly sent to him in 1995, and no evidence undisputably shows that he did, we shall not comment on its contents given the posture of this appeal.

But the 1998 NIOSH beryllium worker study is different. While Vitalo might not remember receiving the informational packet, the several forms he endorsed and returned—the authenticity of which Vitalo does not dispute—make clear that he received and reviewed the packet. Quite simply, the NIOSH packet made obvious that Vitalo's health problems could be related to beryllium exposure. The letter explicitly explained that Vitalo had been targeted to receive the correspondence because of his potential exposure to beryllium. Moreover, the packet described the symptoms of beryllium-related disease, some of which Vitalo had complained of approximately one year before receiving the packet when he visited Dr. Bub and was referred to Dr. Mariglio (after receiving Dr. Gaziano's troubling report indicating lung disease).

Most significantly, Vitalo received a series of medical test results and diagnoses that, taken as a whole and together with the other information discussed already,

put him on notice of his potential claim by May 1999 at the latest. Putting aside the 1959 beryllium poisoning diagnosis, in June of 1996 Vitalo underwent a lung x-ray that indicated chronic obstructive pulmonary disease. A follow-up x-ray in January, 1997 revealed "increased interstitial lung markings due to chronic process." Dr. Gaziano's June 1997 report, on the basis of yet another chest x-ray, disclosed "evidence of an occupational lung disease." Dr. Mariglio's subsequent CAT scan of the chest and pulmonary function study .confirmed these earlier diagnoses and led Dr. Mariglio to explain to Vitalo that he had "[o]ccupational-related lung disease." In December 1998 Vitalo received Dr. Schonfeld's advice to seek additional medical testing. Finally, in May 1999 Vitalo received Dr. Rosenman's NIOSH study test results, which explained that Vitalo's "x-ray showed scarring in [his] lung which may be caused by beryllium" and "recommend[ed] ... further testing [offered free of charge] to determine if [Vitalo had] chronic beryllium disease."

We need not here determine the precise time Vitalo gained awareness of sufficient critical facts to put him on notice of his potential claim. We conclude only that as a matter of law Vitalo was on notice by May 1999 at the latest that he was injured, it might be CBD, and his injury was occupationally related.

▮ Vitalo advances a single argument to justify his delay in seeking additional testing and treatment—that "he reasonably relied on the definitive diagnosis of asbestosis." Appellants' Brief at 18. After consenting to participate in Dr. Rosenman's NIOSH study, but before receiving Dr. Rosenman's results, Vitalo was examined by Dr. Schonfeld (on behalf of the Moody firm) for potential asbestos-related injury. Construing the facts in the light most favorable to Vitalo, he "[w]as defini-

tively diagnosed with asbestosis by Dr. Schonfeld on December 16, 1998." *Id.* at 17. Vitalo argues that this misdiagnosis trumps his awareness of facts tending to put him on notice of the beryllium-related wrong committed against him. That is, by the time he received Dr. Rosenman's report, he argues, he already knew the cause of his lung scarring and thus reasonably disregarded information suggesting another cause and advice to seek additional testing.

In support of this argument, Vitalo relies on our decision in *Debiec.* In broad terms, *Debiec* took up the question of "how to measure the impact of a professional medical diagnosis on a court's evaluation of whether a plaintiff has exercised reasonable diligence in investigating her condition." *Debiec,* 352 F.3d at 130. But in *Debiec* we examined whether, and to what extent, a plaintiff can reasonably rely on a doctor's conclusion that she does *not* have a certain condition, notwithstanding suspicions to the contrary. *Id.* at 132. In that context, we explained that "a definitive *negative* diagnosis may be sufficient in some cases to overcome the fact that the claimant harbored suspicions that she had a particular injury." *Id.* (emphasis added). Debiec was diagnosed as having sarcoidosis. In making this diagnosis, her doctor explicitly ruled out beryllium-related disease. As the majority stressed, her doctor "did not alter his diagnosis of Debiec's condition, that she had sarcoidosis[,] not CBD, during her lifetime." *Id.* at 124. The majority ultimately held that a reasonable jury *could* conclude that Debiec reasonably relied on the *negative* diagnosis, and thus the statute of limitations did not begin for her despite the indicators of CBD. *Id.* at 136 ("[R]easonable minds could differ on the question whether De-

biec employed reasonable diligence in pursuing the cause of her injury.").

Vitalo's effort to stretch our holding in *Debiec* to accommodate the facts of his case is unavailing. Quite simply, Vitalo was never told that he did not have beryllium-related lung disease. In fact, even the "definitive" diagnosis of asbestosis by Moody's Dr. Schonfeld—prepared in aid of asbestos-claim litigation—was accompanied by a recommendation that Vitalo seek additional testing, a recommendation Vitalo failed to heed. Moreover, less than six months after receiving this diagnosis, Vitalo heard back from Dr. Rosenman, who informed him: "Your x-ray showed scarring in your lung which may be caused by beryllium. [B]ecause of the scarring in your lung, we would recommend you have further testing to determine if you have chronic beryllium disease." Thus, by May 1999 Vitalo had been diagnosed with asbestosis by Dr. Schonfeld, who recommended further testing, *and* informed by Dr. Rosenman that he should undergo further testing to determine if he had CBD. His clock to check this out and determine the correct cause of his condition had begun. By the time he filed—two years and seven months later—the limitation period had expired.[3]

In this context, we have no option but to conclude that by failing to seek additional medical testing after May 1999 at the latest, Vitalo failed to exercise reasonable diligence and thus cannot invoke the safe harbor provided by the discovery rule.

\* \* \* \* \* \*

We conclude as a matter of law that (1) by May 1999 Vitalo was on notice that he was occupationally injured and might well have CBD, yet (2) he failed to exercise reasonable diligence in investigating his

---

**3.** Interestingly, once CBD was definitively diagnosed in Vitalo's case in January 2001, he

still had approximately four months to sue before the expiration of the limitations period.

potential claim. Having reached these conclusions, we affirm the District Court's grant of summary judgment to the defendants in this case.