**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-3821
_____

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY

v.

PARKSHORE DEVELOPMENT CORPORATION; CATALINA COVE
CONDOMINIUM ASSOCIATION, INC.; KEEN'S CAULKING AND
WATERPROOFING; ABC CORPORATION I THROUGH ABC
CORPORATION X fictitious names

Parkshore Development Corporation,

Appellant

_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 07-cv-01331)
District Judge: Hon. Robert B. Kugler

Submitted November 19, 2010

Before: BARRY, CHAGARES, and VANASKIE, <u>Circuit</u> <u>Judges</u>.

(Filed December 10, 2010)

_____

OPINION OF THE COURT

_____

CHAGARES, Circuit Judge.

Parkshore Development Corporation ("Parkshore") appeals the District Court's grant of summary judgment which relieved its insurer, Pennsylvania National Mutual Casualty Insurance Company, from providing coverage for claims of water damage stemming from faulty workmanship by subcontractors at a Parkshore condominium development project. The District Court determined there was no coverage under the policy because there was no "occurrence" due to the fact that the only damage was to the property itself. For the reasons that follow, we will affirm the judgment of the District Court.

I.

We write for the parties' benefit and recite only the facts essential to our disposition. Parkshore was the developer and general contractor of the Catalina Cove Condominiums in Linwood, New Jersey. Parkshore hired subcontractors to perform all of the work and construction at the site including roofing, framing, installing windows and doors, caulking and sealing, installing vent hoods, implementing an irrigation system, grading, setting the foundation, and installing gutters and leaders. Parkshore completed the first unit at Catalina Cove in 1989 and the project was finished in 1998. In July 1999, the Catalina Cove Condominium Association ("CCCA") notified Parkshore that stucco around some of the windows had not been caulked properly, causing water leakage. Parkshore hired Keen's Caulking & Waterproofing to re-caulk the windows.

In October 2006, the CCCA filed a complaint in the Superior Court of New Jersey alleging claims against Parkshore for breach of contract, negligence, breach of implied

warranties in the design and construction of the condominiums, negligence in failing to remediate properly the water damage, and for violations of the New Jersey Consumer Fraud Act. To support these allegations, the CCCA's expert, Michael Hyland, reported that there were multiple deficiencies in the site grading and drainage which allowed water to enter the crawl space and cause damage. Additionally, Hyland concluded that the final project failed to conform to building code requirements and deviated from the approved engineering site plan. In a supplemental report, Hyland detailed more deficiencies in the roofing, siding, window installation, framing, wood trim and irrigation which resulted in water penetration and caused damage to the framing, sheathing, windows, casings and stucco finish.

Parkshore tendered the defense and indemnification of this action to Pennsylvania National Mutual Casualty Insurance Company ("Penn National"). Penn National issued a Commercial General Liability ("CGL") policy to Parkshore for every year beginning March 7, 1989 through March 7, 2006. On March 22, 2007, Penn National filed a declaratory judgment action in the District Court seeking a declaration that it had no obligation to provide insurance coverage to Parkshore in the CCCA lawsuit. The District Court granted Penn National's summary judgment motion on all claims except those for consumer fraud,[1] finding that the allegations in the lawsuit filed by the CCCA did not give rise to an "occurrence" under the policy. On September 23, 2009, Parkshore filed this appeal.

---

[1] Before this appeal, the parties agreed to dismiss the insurance coverage claims related to the consumer fraud issues in the underlying case.

The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332 and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291.  Our review of the District Court's grant of summary judgment is plenary, and we apply the same legal standard as it should have.  Vitalo v. Cabot Corp., 399 F.3d 536, 542 (3d Cir. 2005).  A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In conducting our analysis, we must view the record in the light most favorable to Parkshore, and must draw all reasonable inferences in its favor.  See Vitalo, 399 F.3d at 542; Fed. R. Civ. P. 56(c).  To defeat summary judgment, however, Parkshore must "produce admissible evidence containing 'specific facts showing that there is a genuine issue for trial.'"  Vitalo, 399 F.3d at 542 (quoting Fed. R. Civ. P. 56(e)).

III.

Parkshore maintains that defective workmanship performed by its subcontractors which caused damage to its non-defective work qualifies as "property damage" caused by an "occurrence," and thus is covered under its CGL policy.  Parkshore contends that the water damage at the CCCA condominiums was an accident that was neither expected nor intended by Parkshore and, as such constitutes an "occurrence."  In support of this interpretation, Parkshore relies on Weedo v. Stone-E-Brick, Inc., 405 A.2d 788 (N.J.

1979), and its progeny to show that construction defects resulting in consequential damage to the property itself could qualify as an "occurrence."[2]

We conclude that Parkshore's interpretation of Weedo is misguided. While Weedo does distinguish between the business risk of repairing a defect and the risk of faulty workmanship that causes consequential damage, the decision does not determine the existence of an "occurrence" where faulty workmanship causes damage to the completed project itself. See Weedo, 405 A.2d at 791 ("The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable." (internal quotation marks omitted)). This conclusion is further enforced by the subsequent holdings in Firemen's Ins. Co. of Newark v. Nat'l Union Fire Ins. Co., 904 A.2d 754 (N.J. Super. Ct. App. Div. 2006), and S.N. Golden Estates, Inc. v. Continental Cas. Co., 680 A.2d 1114 (N.J. Super. Ct. App. Div. 1996). See Firemen's, 904 A.2d at 761-63 (applying Weedo, the court found that faulty workmanship whether performed by a contractor or subcontractor which causes damage to the general contractor's work is not an "occurrence"); S.N. Golden, 680 A.2d at 1117, 1119 (finding an "occurrence" because the insured's faulty construction of septic systems caused damage to neighboring

---

[2] Parkshore also supports its position by relying on the commentary of the Insurance Services Office's 1986 edition of the CGL coverage form and by evaluating the CGL exclusions to determine the intent of the coverage. We have considered these arguments and find that they are not persuasive in establishing an "occurrence" under the CGL policy.

5

residents' homes). While other courts have permitted an "occurrence" where faulty construction damages only the insured's own work,[3] New Jersey courts foreclose such a possibility. Therefore, we conclude that Parkshore's arguments are not persuasive in establishing an "occurrence" under the CGL policy.

IV.

Accordingly, we will affirm the District Court's order granting summary judgment to Penn National.

---

[3] Subcontractors did all of the work at the condominium project, but the whole project nonetheless was Parkshore's "own work" because Parkshore was the general contractor. See Firemen's, 904 A.2d at 761.