NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2767-13T1

CYPRESS POINT CONDOMINIUM
ASSOCIATION, INC.,

     Plaintiff-Appellant/
     Cross-Respondent,

v.

ADRIA TOWERS, L.L.C.; D. LOUREIRO
MASONRY CONTRACTOR; DEAN MARCHETTO
ASSOCIATES, P.C.; PEREIRA CONSTRUCTION,
L.L.C.; AMERICAN ARCHITECTURAL
RESTORATION; METRO HOMES, L.L.C.;
COMMERCE CONSTRUCTION MANAGEMENT, L.L.C.;
WATERFRONT MANAGEMENT SYSTEMS, L.L.C.;
NCF GLAZING & ERECTING, INC.; and
MDNA FRAMING, INC.,

     Defendants,

and

WEATHER-TITE,

     Defendant/Third-Party
     Plaintiff,

v.

PEREIRA CONSTRUCTION, L.L.C., and
AMERICAN ARCHITECTURAL RESTORATION,

     Third-Party Defendants,

and

APPROVED FOR PUBLICATION

July 9, 2015

APPELLATE DIVISION

EVANSTON INSURANCE COMPANY,

 Defendant/Third-Party
 Plaintiff-Respondent/
 Cross-Appellant,

and

NATIONAL INDEMNITY COMPANY,

 Third-Party Defendant,

and

CRUM & FORSTER SPECIALTY
INSURANCE COMPANY,

 Third-Party Defendant-
 Respondent/Cross-Appellant.

_____

Argued May 27, 2015 — Decided July 9, 2015

Before Judges Yannotti, Fasciale and Hoffman.

On appeal from Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-2260-11.

Mark M. Wiechnik argued the cause for appellants/cross-respondents Cypress Point Condominium Association, Inc., (Ansell Grimm & Aaron, P.C., attorneys; Mr. Wiechnik and Breanne M. DeRaps, on the brief).

Elliott Abrutyn argued the cause for respondent/cross-appellant Evanston Insurance Company (Morgan Melhuish Abrutyn, attorneys; Mr. Abrutyn, of counsel; Mr. Abrutyn and Thomas G. Rantas, on the brief).

John S. Favate argued the cause for respondent/cross-appellant Crum & Forster Specialty Insurance Company (Hardin, Kundla,

 

McKeon & Poletto, P.A., attorneys; George R. Hardin and Arthur A. Povelones, Jr., of counsel; Mr. Hardin, Mr. Povelones, and Brian C. Alfson, on the brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

Plaintiff, a condominium association, brought claims against the association's developer, Adria Towers, L.L.C. (the "developer"), the developer's insurers, Evanston Insurance Company ("Evanston") and Crum & Forster Specialty Insurance Company ("Crum & Forster") (collectively the "insurers"), and various subcontractors (the "subcontractors"). The developer served as the general contractor on the condominium project and hired the subcontractors who performed all the construction work. Plaintiff sought coverage from the insurers under the developer's commercial general liability ("CGL") insurance policies for consequential damages caused by the subcontractors' defective work.[1]

The judge determined that there was no "property damage" or "occurrence" as required by the policy to trigger coverage, granted summary judgment to Evanston, and dismissed the complaint against Crum & Forster as moot. Plaintiff appeals

---

[1] The insurers' policies contain the same pertinent language. We therefore refer to the policies hereinafter in the singular (the "policy"). Plaintiff's standing to bring this lawsuit is not contested on appeal.

from a January 31, 2014 order denying reconsideration of the order granting summary judgment to Evanston. The insurers cross-appeal from various orders contending that if we reverse on plaintiff's appeal, then we should address their arguments raised, but not considered, by the judge.[2]

We review the denial of a motion for reconsideration to determine whether the trial court abused its discretionary authority. Cummings v. Bahr, 295 N.J. Super. 374, 389 (App. Div. 1996). When reviewing an order granting summary judgment, we apply the same standards that the trial court applied when ruling on the motion. Oyola v. Xing Lan Liu, 431 N.J. Super. 493, 497 (App. Div.), certif. denied, 216 N.J. 86 (2013).

The sole question in this appeal is whether consequential damages to the common areas of the condominium complex and to the unit owners' property, caused by the subcontractors' defective work, constitute "property damage" and an "occurrence" under the policy. We consider this issue by interpreting the plain language of the policy, which follows the Insurance

---

[2] Evanston cross-appeals from orders dated March 16, 2012 (granting plaintiff's motion to assert a direct claim against Evanston); November 8, 2013 (granting summary judgment to Evanston); December 12, 2013 (dismissing Crum & Forster's third-party complaint against Evanston); and January 31, 2014 (denying plaintiff's motion for reconsideration). Crum & Forster cross-appeals from the December 12, 2013 order dismissing as moot plaintiff's claims against it.

Services Office, Inc.'s ("ISO") 1986 standard CGL form (the "1986 ISO form"). Applying the relevant standards, we reverse the order denying reconsideration, set aside the orders dismissing plaintiff's complaint, and remand with instructions to consider the insurers' alternate contentions that plaintiff's claims are otherwise excluded under the policy.

We hold that the unintended and unexpected consequential damages caused by the subcontractors' defective work constitute "property damage" and an "occurrence" under the policy. We base this holding in part on the developer's reasonable expectation that, for insurance risk purposes, the subcontractors' faulty workmanship is to be treated differently than the work of a general contractor. We reach that conclusion by viewing the policy as a whole and distinguishing Weedo v. Stone-E-Brick, Inc., 81 N.J. 233 (1979), and Firemen's Insurance Co. of Newark v. National Union Fire Insurance Co., 387 N.J. Super. 434 (App. Div. 2006), two opinions construing ISO's 1973 standard CGL form (the "1973 ISO form").

I.

We view the facts in the light most favorable to plaintiff, as we must do at this stage. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

The subcontractors failed to properly install the roof, flashing, gutters and leaders, brick and EIFS facade, windows, doors, and sealants (the "faulty workmanship"). The faulty workmanship amounted to what has typically been considered in the construction industry as defective work. In the insurance industry, such replacement costs are usually regarded as a cost of doing business and are considered a "business risk." See Heldor Indus. v. Atl. Mut. Inc. Co., 229 N.J. Super. 390, 396 (App. Div. 1988) (stating that "the insured assumes the risk of necessary replacement or repair . . . as a part of the cost of doing business"). Plaintiff has not argued that the replacement costs constitute "property damage" and an "occurrence" under the policy.

According to plaintiff, the faulty workmanship also caused consequential damages to the "common areas and unit owners' property [including] damage to steel supports, exterior sheathing and interior sheathing and sheetrock, insulation and other interior areas of the building, both visible and latent[.]" Some unit owners experienced "water infiltration at the interior window jambs and sills[,]" and "roof leaks." Other unit owners "experienced significant damage to the interior of their units, including exterior wall sheathing, wall cavity

A-2767-13T1

insulation, insulation sheetrock, wall finishes, wood flooring, and trim."

In relation to sharing the cost of risks as a matter of insurance underwriting, consequential damages flowing from defective work are vastly different than the costs associated with replacing the defective work. See Hartford Ins. Grp. v. Marson Constr. Corp., 186 N.J. Super. 253, 258-59 (App. Div. 1982) (holding that defective work causing damage to other property is not a business risk), certif. denied, 93 N.J. 247 (1983); Newark Ins. Co. v. Acupac Packaging, Inc., 328 N.J. Super. 385, 392-93 (App. Div. 2000) (noting that damage to third-party property is a tort liability and not a business risk or work performance issue).

On appeal, plaintiff raises two principal arguments. First, plaintiff contends that under a plain reading of the language in the policy, the consequential damages constitute "property damage" and an "occurrence." Plaintiff asserts that we must conduct this initial threshold analysis. If a determination is made that "property damage" and an "occurrence" exist, plaintiff concedes that the insurers would be free to argue, on remand, that plaintiff's claims are otherwise excluded under the terms of the policy.

Second, plaintiff argues that the judge erroneously placed substantial reliance on the holdings in Weedo and Firemen's to determine whether there existed "property damage" and an "occurrence." Plaintiff maintains that those cases are distinguishable because they (1) involved only replacement costs flowing from a business risk rather than consequential damages caused by defective work; and (2) interpreted different policy language.

## II.

We begin by addressing plaintiff's first contention, that there exists "property damage" and an "occurrence" under the plain language of the policy. The following well-settled principles inform our analysis of the policy's terms.

A court's interpretation of an insurance contract is a determination of law. Sealed Air Corp. v. Royal Indem. Co., 404 N.J. Super. 363, 375 (App. Div.), certif. denied, 196 N.J. 601 (2008). We afford no special deference to a trial court's interpretation of the law and the legal consequences that flow from the established facts. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Accordingly, we review a trial court's interpretation of an insurance policy de novo. Sealed Air, supra, 404 N.J. Super. at 375.

An insurance policy must be construed "as a whole and effect given to every part thereof." Herbert L. Farkas Co. v. N.Y. Fire Ins. Co., 5 N.J. 604, 610 (1950); Arrow Indus. Carriers, Inc. v. Cont'l Ins. Co. of N.J., 232 N.J. Super. 324, 334-35 (App. Div. 1989) (noting that our "responsibility is to give effect to the whole policy, not just one part of it"). When interpreting insurance contracts, we begin by first examining the plain language of the policy. Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 270-71 (2008). If the terms are clear, then we give them their plain and ordinary meaning. Ibid. Construction of the insurance policy must be "consistent with the insured's reasonable expectations." Sealed Air, supra, 404 N.J. Super. at 376 (internal citation and quotation marks omitted).

Here, the language of the policy follows the 1986 ISO form. The policy provides the terms for coverage in Section I, A.1, with certain words defined in Section V. These sections provide in pertinent part:

SECTION I — COVERAGES

COVERAGE A.   BODILY INJURY & PROPERTY DAMAGE LIABILITY

1.  Insuring Agreement.

a. We will pay those sums that the Insured becomes legally obligated to pay as damages because of . . .

"property damage" to which this insurance [policy] applies.

. . . .

b. This insurance applies to . . . "property damage" only if:

(1) The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
(2) The . . . "property damage" occurs during the policy period.[3]

. . . .

SECTION V — DEFINITIONS

. . . .

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

. . . .

16. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property . . .; or

b. Loss of use of tangible property that is not physically injured.

_____

[3] The parties do not dispute that the alleged "property damage" occurred within the "coverage territory" and policy period.

A-2767-13T1

Although the policy does not define the term "accident," our Supreme Court has held that "the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury." Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 183 (1992).

Section I, A.1 is followed by Section I, A.2, which provides separate language excluding various claims. Thus, before reaching the policy's exclusions, the insuring agreement requires that there be an initial determination of whether there is "property damage" and an "occurrence." Construing the language in Section I, A.1, we conclude that the consequential damages here amount to "property damage" and an "occurrence."

As to whether there exists "property damage," the consequential damages clearly constitute "physical injury to tangible property." The faulty workmanship damaged "the common areas and unit owners' property[.]" The interior structures, including the drywall, insulation, wall finishes, and wood flooring, were damaged by water infiltration from the faulty workmanship. As a result, the consequential damages constitute "property damage" as defined under the policy.

As to whether there exists an "occurrence," the consequential damages amount to an unexpected and unintended "continuous or repeated exposure to substantially the same

general harmful conditions." The insurers do not contend, and we cannot reasonably believe, that the subcontractors either expected or intended for their faulty workmanship to cause "physical injury to tangible property." Thus, the consequential damages constitute an "occurrence" as defined in the policy.

### III.

Turning to plaintiff's second argument, we conclude that in granting summary judgment, the trial judge erroneously applied the holdings in Weedo and Firemen's. Those cases are distinguishable because they (1) involved only replacement costs flowing from a business risk, rather than consequential damages caused by defective work; and (2) interpreted different language than the policy language in this appeal.

### A.

In Weedo, the Court did not resolve whether consequential damages resulting from subcontractors' faulty workmanship constituted "property damage" or an "occurrence." Rather, the Court focused only on issues related to insurance coverage. The insurer conceded that "but for the exclusions in the policy, coverage would obtain." Weedo, supra, 81 N.J. at 237-38 n.2. Implicit in this concession, therefore, is the tacit admission that there was an "occurrence" and "property damage."

The Weedo Court, in interpreting the 1973 ISO form, held that there was no insurance coverage for "faulty workmanship . . . where the damages claimed [were solely] the cost of correcting the work itself." Id. at 235. The Court considered such business—risk damages to be uninsurable. Id. at 240-41. Here, unlike in Weedo, the consequential damages are not defective-work damages. In other words, the consequential damages are distinct from the cost of correcting the work itself. Thus, the holding in Weedo is not dispositive on the issue presented in this appeal.

In Firemen's, we also interpreted the 1973 ISO form. We concluded that there was no "property damage" or "occurrence," and thus no insurance coverage, for damages that were solely related to replacing sub-standard firewalls because the damages were a business risk, not consequential damages. Firemen's, supra, 387 N.J. Super. at 443-45. We noted in Firemen's, unlike here, that there were no allegations of damages to the "rest of the building," and we followed Weedo indicating that the replacement of the defective work — a business risk — was uninsurable. Id. at 443, 446.

Even though Firemen's did not involve consequential damages, we acknowledged that "the risk of . . . [consequential] damage to property caused by faulty workmanship," like here, is

13                                          A-2767-13T1

a different type of risk than the cost of doing business.  Id.
at 443 (internal citations and quotation marks omitted).  We
stated that

> [u]nlike business risks . . . where the
> tradesman commonly absorbs the cost
> attendant upon the repair of his faulty
> work, the accidental injury to property or
> persons substantially caused by his
> unworkmanlike performance exposes the
> contractor to almost limitless liabilities.
> While it may be true that the same
> neglectful craftsmanship can be the cause of
> both a business expense of repair and a loss
> represented by damage to persons and
> property, the two consequences are vastly
> different in relation to sharing the cost of
> such risks as a matter of insurance
> underwriting.
>
> [Ibid. (emphasis added) (quoting Weedo,
> supra, 81 N.J. at 239-40) (internal
> quotation marks omitted).]

Thus, this case falls within the caveat that Weedo and
Firemen's expressly recognized, and accords with our prior
holdings in Hartford Insurance, supra, 186 N.J. Super. at 258-
59, and Newark Insurance, supra, 328 N.J. Super. at 393.  We
emphasize that the consequential damages here are not the cost
of replacing the defective work — that is the improperly
installed roof, flashing, gutters and leaders, brick and EIFS
facade, windows, doors, and sealants.  Those costs are
considered a business risk associated with faulty workmanship.
Rather, the consequential damages are those additional damages

to the common areas of the condominium building and the unit owners' property. The consequential damages are therefore not the cost of correcting the defective work, such as the cost of replacing the stucco in the <u>Weedo</u> case or replacing the firewalls as in <u>Firemen's</u>, but rather the cost of curing the "property damage" arising from the subcontractors' faulty workmanship.

## B.

There are also two critical differences between the 1973 ISO form considered in <u>Firemen's</u> and the 1986 ISO form in this case. These differences provide additional support for our conclusion that the trial court's reliance on the holding in <u>Firemen's</u> is misguided.

First, "occurrence" is defined differently. The 1973 ISO form defines "occurrence" as "'an accident . . . which results in . . . property damage neither expected nor intended from the standpoint of the insured.'" <u>Firemen's</u>, <u>supra</u>, 387 <u>N.J. Super.</u> at 441. Here, the policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage," therefore, is not directly included in the policy's definition of "occurrence," and <u>Firemen's</u> is consequently not squarely on point.

Second and most importantly, the 1986 ISO form includes a significant exception to an exclusion not contained in the 1973 ISO form. Due to this exception, we conclude that for insurance risk purposes, consequential damages caused by a subcontractor's faulty workmanship are considered differently than property damage caused by a general contractor's work.

Pertinent to our conclusion that reliance on <u>Firemen's</u> is misplaced, the policy contains the following exclusionary language that did not appear in the policy we considered in <u>Firemen's</u>:

> 2. Exclusions.
>
> This insurance does not apply to:
>
> > . . . .
> >
> > l. Damage to Your Work [the "Your Work" Exclusion][4]
> >
> > "Property damage" to "your work" arising out of it or any part of it . . . .
> >
> > <u>This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor</u>. [The "subcontractor's exception"].
> >
> > [(Emphasis added).]

---

[4] The "Your Work" exclusion is premised on the concept of the contractor's business risk.

The policy defines "Your Work" as:

>a. Work or operations performed by you or on your behalf; and

>b. Materials, parts or equipment furnished in connection with such work or operations.

Although we need not resolve whether plaintiff's property damage claims are excluded under the policy, the addition of the subcontractor's exception is of critical importance when determining whether the subcontractors' faulty workmanship causing consequential damages amounts to "property damage" and an "occurrence" under the policy. The subcontractor's exception did not appear in ISO forms before 1986. Commentators have observed that ISO added the subcontractor's exception because

>the insurance and policyholder communities agreed that the CGL policy should provide coverage for defective construction claims so long as the allegedly defective work had been performed by a subcontractor rather than the policyholder itself. This resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage.

>[Christopher C. French, Construction Defects: Are They "Occurrences"?, 47 Gonz. L. Rev. 1, 8-9 (2011) (citing Jeffery W. Stempel, Stempel on Insurance Contracts § 14.13d at 14-224.8 (3d ed. supp. 2007)).]

ISO also provided guidance regarding the subcontractor's exception by making clear that the policy "'cover[ed] damage

A-2767-13T1

caused by faulty workmanship to other parts of work in progress; <u>and damage to, or caused by, a subcontractor's work after the insured's operations are completed</u>.'"  U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 879 (Fla. 2007) (alteration in original) (emphasis added) (quoting ISO Circular, Commercial General Liability Program Instructions Pamphlet, No. GL-86-204 (July 15, 1986)).

As a practical matter, it is very difficult for a general contractor to control the quality of a subcontractor's work.  If the parties to the insurance contract did not intend a subcontractor's faulty workmanship causing consequential damages to constitute "property damage" and an "occurrence," as those terms are defined in the policy, then it begs the question as to why there is a subcontractor's exception.

The absence of such an exception in the 1973 ISO form is important because in defining "property damage" to effectuate insurance coverage, we previously rejected any attempt to separate a subcontractor's faulty workmanship from that of a general contractor.  In Firemen's, supra, we recognized that cases interpreting the 1973 ISO form "equate[d] subcontractors with general contractors for the purposes of determining whether there was 'property damage[.]'"  387 N.J. Super. at 446.  But here, the policy includes the subcontractor's exception.  Thus,

as a matter of an insurance underwriting risk, the exception treats consequential damages caused from faulty workmanship by subcontractors differently than damage caused by the work of general contractors.

Even though we were not required to consider whether there was an "occurrence" in Firemen's because we had concluded that there was no "property damage," we noted that "the majority rule [at that time was] that faulty workmanship [did] not constitute an 'occurrence.'" Id. at 448. We made that statement, however, analyzing the 1973 ISO form in a case involving only damages related to a business risk.

In Firemen's, we cited out-of-state case law involving the pre-1986 ISO form, which provided that "'[t]he completed product is to be viewed as a whole, not as a grouping of component parts.'" Id. at 446 (quoting Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co., 396 N.W.2d 229, 236-37 (Minn. 1986)). But once again, we were construing a different insurance policy and equating, for insurance underwriting risk purposes, the work of subcontractors with that of general contractors. Here, the trial court's treatment of the subcontractors' work and the developer's completed product "as a whole," ignores the import and purpose of the subcontractor's exception.

Thus, looking at the policy in its entirety, the developer would reasonably expect that consequential damages caused by the subcontractors' faulty workmanship constituted "property damage" and an "occurrence." This reasonable expectation is supported by applying the definitions of "property damage" and "occurrence" together with the subcontractor's exception and its purpose.

## IV.

We also find persuasive that "the majority rule [currently] is that construction defects [causing consequential damages] constitute 'occurrences[.]'" Construction Defects, supra, 47 Gonz. L. Rev. at 24-26. The leading case decided by the Florida Supreme Court, United States Fire Insurance Co., supra, held that under the same policy language as here, consequential damage caused by defective work constituted "property damage" and an "occurrence" under the policy. 979 So. 2d at 889-891. The Court concluded that

> faulty workmanship that is neither intended nor expected . . . can constitute an "accident" and thus an "occurrence" under a post-1986 standard form CGL policy. We further conclude that physical injury to the completed project that occurs as a result of the defective work can constitute "property damage" as defined in a CGL policy.
>
> [Id. at 891.]

A-2767-13T1

It is notable that the Florida Supreme Court distinguished the holding in Weedo by stating that Weedo "involved the issue of whether there was coverage for the contractor's own defective work, [and] was dependent on the policy language of pre-1986 CGL policies, including the relevant insuring provisions and applicable exclusions." Id. at 882.

Other courts have also reached the same conclusion. The United States Court of Appeals for the Fourth Circuit, applying Maryland law, found that under the same policy language as here, liability coverage existed "for the cost to remedy unexpected and unintended [consequential] property damage to the contractor's otherwise non-defective work-product caused by the subcontractor's defective workmanship." French v. Assurance Co. of Am., 448 F.3d 693, 706 (4th Cir. 2006); see also Construction Defects, supra, 47 Gonz. L. Rev. at 25-27, n.78-92 (listing cases that reached similar holdings from the Supreme Courts of Georgia, Texas, Kansas, Indiana, Minnesota, Alaska, Mississippi, South Carolina, South Dakota, Tennessee, and Wisconsin).

The judge in this case found persuasive the reasoning expressed by the Third Circuit in an unpublished and non-precedential case, Pennsylvania National Mutual Casualty Insurance Co. v. Parkshore Development Corp., 403 Fed. Appx. 770 (3d Cir. 2010). The Third Circuit remarked that we concluded in

_Firemen's_ that "faulty workmanship[,] whether performed by a contractor or subcontractor[,] which causes damage to the general contractor's work[,] is not an 'occurrence.'" _Id._ at 772. In _Firemen's_, however, we interpreted the 1973 ISO form, which omitted any reference to the subcontractor's exception to the "Your Work" exclusion. As a result, any such reliance on _Firemen's_ is respectfully misplaced.

## V.

Interpreting "occurrence" under the policy to include unexpected and unintended consequential damages caused by the subcontractors' faulty workmanship will not convert the policy into a performance bond. _See_ _United States Fire_, _supra_, 979 _So._ 2d at 887-88. A performance bond guarantees the completion of a construction contract if a contractor defaults, and unlike an insurance policy, it benefits the project owner rather than the contractor. _Ribeira & Lourenco Concrete Constr. v. Jackson Health Care Assoc._, 254 _N.J. Super._ 445, 451-54 (App. Div. 1992). A surety, unlike a liability insurer, is also entitled to indemnification from the contractor. _Montefusco Excavating & Contractor Co. v. Cnty. of Middlesex_, 82 _N.J._ 519, 525 (1980).

Moreover, although we express no opinion as to the weight of any potential cross-claim against the subcontractors or their insurance companies, we note that the policy contains an

endorsement requiring that the subcontractors name the developer as an additional insured on the subcontractors' insurance policies, and the endorsement requires the subcontractors to maintain CGL insurance in an amount of at least "equal" to the insurance provided in the policy. As a result, such purported added insurance protections further prevent the policy from acting solely like a performance bond by arguably shifting the insurers' indemnification obligations to the subcontractors and their insurance companies.

VI.

Finally, concluding that plaintiff met the definitions of "property damage" and "occurrence" under the policy does not automatically mean that insurance coverage exists. We do not reach the question of whether plaintiff is entitled to insurance coverage under the policy. The insurers contended before the judge that even if there were "property damage" and an "occurrence" under the policy, plaintiff's claims would otherwise be excluded. The judge never reached those issues, and we decline to do so here.

It is well-established that we "may exercise such original jurisdiction as is necessary to complete the determination of any matter on review." R. 2:10-5. However, original jurisdiction should be exercised with "great frugality" and not

23

when there is a need to "weigh[] evidence anew" or "mak[e] independent factual findings[.]" State v. Micelli, 215 N.J. 284, 293 (2013) (alterations in original) (citations and internal quotation marks omitted). The Micelli Court cautioned against what the insurers are now urging us to do.

Although we decline to exercise original jurisdiction and address the issues raised by the insurers in their cross-appeals, the insurers may argue, as plaintiff concedes, on remand that the exclusions in the policy preclude coverage.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION