SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Cypress Point Condominium Association, Inc. v. Adria Towers, L.L.C., et al.** (A-13/14-15) (076348)

**Argued April 25, 2016 -- Decided August 4, 2016**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the Court determines whether rain water damage caused by a subcontractor's faulty workmanship constitutes "property damage" and an "occurrence" under a property developer's commercial general liability (CGL) insurance policy.

This dispute arose from the construction of Cypress Point, a luxury condominium complex in Hoboken. Co-defendants Adria Towers, LLC, Metro Homes, LLC, and Commerce Construction Management, LLC (collectively, the developer) served as the project's developer and general contractor, and subcontractors carried out most of the work. During construction, the developer obtained four CGL policies from Evanston Insurance Company, covering a four-year period, and three from Crum & Forster Specialty Insurance Company, covering a subsequent three-year period (collectively, the policies). The policies, which are modeled after the 1986 version of the standard form CGL policy promulgated by the Insurance Services Office, Inc. (ISO), provide coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . caused by an 'occurrence' that takes place in the 'coverage territory' . . . [and] . . . occurs during the policy period."

Under the policies, "property damage" includes "[p]hysical injury to tangible property including all resulting loss of use of that property," while an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The policies also contain an exclusion, for "Damage to Your Work" (the "your work" exclusion), which eliminates coverage for "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" Notably, this exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on [the insured's] behalf by a subcontractor."

After completion of the complex, several residents began experiencing problems, such as roof leaks and water infiltration around windows in units and common areas. Plaintiff the Cypress Point Condominium Association (the Association) brought an action against the developer and several subcontractors, alleging faulty workmanship during construction and claiming various consequential damages. Ultimately, a question arose as to whether the Association's claims were covered by the insurers' CGL policies. Subsequently, the insurers moved for summary judgment, arguing, in part, that they were not liable because the subcontractors' faulty workmanship did not constitute an "occurrence" that caused "property damage" as defined by the policies. The trial court agreed and granted the motion.

In a published decision, Cypress Point Condominium Association, Inc. v. Adria Towers, L.L.C., 441 N.J. Super. 369, 373 (App. Div. 2015), the Appellate Division reversed, holding that, under the plain language of the CGL policies, the unintended and unexpected consequential damages caused by the subcontractors' faulty workmanship constituted "property damage" and an "occurrence." The Court granted the insurers' petitions for certification. 223 N.J. 355 (2015).

**HELD:** The consequential damages caused by the subcontractors' faulty workmanship constitute "property damage," and the event resulting in that damage – water from rain flowing into the interior of the property due to the subcontractors' faulty workmanship – is an "occurrence" under the plain language of the CGL policies at issue here.

1. Since there is no genuine issue of material fact before the Court, it reviews de novo the trial court's conclusion that the insurers were not obligated to defend and indemnify the developer against the Association's claims. The Court has long recognized that the general principles governing the interpretation of insurance policies must be analyzed under the rules of contract law. When interpreting the meaning of a provision in an insurance contract, courts look first to its plain language. If the terms of the provision are clear, it will be enforced as written. If the provision is subject to more than one reasonable interpretation, a court will look to extrinsic evidence to aid in its interpretation. With respect to insurance contracts specifically, if the policy's controlling language supports two meanings, the interpretation favoring coverage should be applied. (pp. 13-16)

2. A CGL policy protects business owners against liability to third-parties. The most commonly purchased CGL policy is based on a standard form issued by the ISO. The ISO promulgated standard form CGL policies in 1973 and again in 1986. The 1986 policy, which was used here, defines an "occurrence" in a way that does not directly include "property damage," stating that an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Unlike the 1973 ISO policy, the 1986 policy also includes a significant exception to the "your work" exclusion clause, which eliminates coverage for "'property damage' to 'your work' arising out of it or any part of it." The exception, which has never been directly addressed by this Court, provides that the exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (pp. 16-19)

3. The seminal New Jersey cases addressing whether construction defects are covered under CGL policies construed the 1973 ISO standard form CGL policy. The issue was first addressed in Weedo v. Stone-E-Brick, Inc., 81 N.J. 233 (1979), under which the Court found that the replacement or repair of faulty goods and works is a business expense, to be borne by the insured, and that CGL policies did not indemnify insureds where the claimed damages are the cost of correcting the alleged defective work. Building on these principles, the Appellate Division in Firemen's Insurance Co. of Newark v. National Union Fire Insurance Co., 387 N.J. Super. 434 (App. Div. 2006), held that claims against an insured general contractor for the cost of replacing materials installed by subcontractors did not qualify as covered "property damage" caused by an "occurrence." The panel distinguished the case from Weedo, explaining that damage for breach of contractual warranty is limited and an expected cost of doing business, whereas liability for damage to a person or property is unpredictable and almost limitless. The CGL policy is designed to ensure against the latter risk. (pp. 19-23)

4. Since this Court has never addressed the question of coverage for consequential damages caused by faulty workmanship under the 1986 ISO standard form CGL policy, review of other state and federal decisions is instructive. The Supreme Court of Florida has held that a subcontractor's defective work can constitute "property damage" caused by an "occurrence" under the 1986 policy, noting that an interpretation precluding recovery for damages caused by a subcontractor's defective work would undermine the subcontractor exception to the "your work" exclusion. The Fourth Circuit Court of Appeals held that the 1986 policy provides coverage for damages caused by a subcontractor's faulty workmanship, but not for the cost of replacing and/or repairing the faulty workmanship itself. These cases, while not controlling, represent a strong recent trend of interpreting the term "occurrence" to encompass unanticipated damage to nondefective property resulting from poor workmanship. (pp. 23-28)

5. Turning first to the question of whether the policies here provide an initial grant of coverage, the Court concludes that the post-construction consequential damages, which resulted in loss of use of the affected areas by residents, were covered "property damage" under the terms of the policies. In order to address the threshold question of whether the subcontractors' faulty workmanship and resultant damages constitute an "occurrence" triggering an initial grant of coverage, the Court must give meaning to the term "accident," which is not defined in the policies. Based on the plain meaning of the term and case law interpreting it in the context of homeowner's policies, the Court finds that "accident" encompasses unintended and unexpected harm caused by negligent conduct. In other words, under the Court's interpretation of the term "occurrence" in the policies, consequential harm caused by negligent work is an "accident." Therefore, because the result of the subcontractors' faulty workmanship – consequential water damage to the completed and nondefective portions of Cypress Point – was an "accident," it is an "occurrence" under the policies and is provided an initial grant of coverage. (pp. 28-34)

6. Since the Association's claims are covered under the policies' general insuring agreement, the Court next examines the pertinent exclusions and, if applicable, any exceptions. Standing alone, the "your work" exclusion, which precludes coverage for "property damage" to "your work," eliminates coverage for water damage to the completed sections of Cypress Point. However, the exception to this exclusion, which was added to the 1986 ISO standard form CGL policy, narrows the exclusion by expressly declaring that it does not apply if the damaged work or work out of which the damage arises was performed by a subcontractor. Thus, because the water damage here is alleged to have arisen out of faulty workmanship performed by subcontractors, it is a covered loss. (pp. 34-39)

The judgment of the Appellate Division is **AFFIRMED** and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA join in JUSTICE SOLOMON's opinion. JUDGE CUFF (temporarily assigned) did not participate.**

CYPRESS POINT CONDOMINIUM
ASSOCIATION, INC.,

Plaintiff-Respondent,

v.

ADRIA TOWERS, L.L.C.; D.
LOUREIRO MASONRY CONTRACTOR;
DEAN MARCHETTO ASSOCIATES,
P.C.; PEREIRA CONSTRUCTION,
L.L.C.; AMERICAN
ARCHITECTURAL RESTORATION;
METRO HOMES, L.L.C.; COMMERCE
CONSTRUCTION MANAGEMENT,
L.L.C.; WATERFRONT MANAGEMENT
SYSTEMS, L.L.C.; NCF GLAZING
& ERECTING, INC.; and MDNA
FRAMING, INC.,

Defendants,

and

WEATHER-TITE,

Defendant/Third-Party
Plaintiff,

and

PEREIRA CONSTRUCTION, L.L.C.;
and AMERICAN ARCHITECTURAL
RESTORATION,

Third-Party Defendants,

and

EVANSTON INSURANCE COMPANY,

Defendant/Third-Party

Plaintiff-Appellant,

and

NATIONAL INDEMNITY COMPANY,

Third-Party Defendant,
and

CRUM & FORSTER SPECIALTY
INSURANCE COMPANY,

Third-Party Defendant-
Appellant.

Argued April 25, 2016 – Decided August 4, 2016

On certification to the Superior Court, Appellate Division, whose opinion is reported at 441 N.J. Super. 369 (App. Div. 2015).

Elliott Abrutyn argued the cause for appellant Evanston Insurance Company (Morgan Melhuish Abrutyn, attorneys; Mr. Abrutyn and Thomas G. Rantas, on the briefs).

Gary S. Kull argued the cause for appellant Crum & Forster Specialty Insurance Company (Carroll McNulty Kull and Hardin, Kundla, McKeon & Poletto, attorneys; Mr. Kull and John S. Favate, of counsel; Mr. Kull, Mr. Favate, Denise Marra DePekary, and Arthur A. Povelones, Jr., on the briefs).

Mark M. Wiechnik argued the cause for respondent (Ansell Grimm & Aaron, attorneys; Breanne M. DeRaps, on the letter brief).

John Randy Sawyer argued the cause for amicus curiae Community Association Institute (Stark & Stark, attorneys; Mr. Sawyer and Gene Markin, on the brief).

Timothy P. Law, Jay M. Levin, and Jill N. Priscott submitted a brief on behalf of amicus curiae United Policyholders (Reed Smith, attorneys).

John P. DiBiasi submitted a brief on behalf of amici curiae Associated General Contractors of America and Associated Construction Contractors of New Jersey (Lewis & McKenna, attorneys; Patrick J. Wielinski, a member of the Texas Bar, of counsel).

Michael A. Barrese and Bethany L. Barrese submitted a brief on behalf of amicus curiae Turner Construction Company (Saxe Doernberger & Vita, attorneys; Gregory D. Podolak, a member of the Connecticut Bar, of counsel).

Carlton T. Spiller, Ellen A. Silver, and Steven B. Gladis, submitted a brief on behalf of amici curiae National Association of Home Builders, New Jersey Builders Association, and Leading Builders of America (Greenbaum, Rowe, Smith & Davis, attorneys).

JUSTICE SOLOMON delivered the opinion of the Court.

In this appeal, we are called upon to determine whether rain water damage caused by a subcontractor's faulty workmanship constitutes "property damage" and an "occurrence" under a property developer's commercial general liability ("CGL") insurance policy.[1]  Here, a condominium association sued its developer/general contractor for damage to the interior

---

[1] CGL policies protect business owners against liability to third parties, encompassing a wide variety of potential claims.  3 Jeffrey E. Thomas, New Appleman on Insurance, Law Library Edition § 16.02[3][a][i], LexisNexis (2015).

structure, residential units, and common areas of the condominium complex, which was allegedly the result of defective work performed by subcontractors.  The condominium association also sued the developer's CGL insurers, seeking a declaration that claims against the developer were covered by the policies.  The trial court granted summary judgment to the insurers, finding that there was no "property damage" or "occurrence," as defined and required by the policies, to trigger coverage.  The condominium association appealed, and the Appellate Division reversed, concluding that "consequential damages caused by the subcontractors' defective work constitute[d] 'property damage' and an 'occurrence' under the polic[ies]."

We affirm the judgment of the Appellate Division and hold that the consequential damages caused by the subcontractors' faulty workmanship constitute "property damage," and the event resulting in that damage –- water from rain flowing into the interior of the property due to the subcontractors' faulty workmanship –- is an "occurrence" under the plain language of the CGL policies at issue here.

I.

We begin with a review of the pertinent facts that gave rise to the instant dispute, which arose from the construction of Cypress Point, a luxury condominium complex in Hoboken consisting of fifty-three residential units.

4

Construction of Cypress Point began in 2002 and was substantially completed in 2004.  During construction, co-defendants Adria Towers, LLC ("Adria Towers"), Metro Homes, LLC ("Metro Homes"),[2] and Commerce Construction Management, LLC ("Commerce Construction")[3] (collectively, "the developer") served as the project's developer and general contractor and hired subcontractors to carry out a substantial majority of the work. Adria Towers also controlled the Cypress Point Condominium Association ("the Association" or "plaintiff") until the fall of 2004, when control of the Association transferred to the unit owners of Cypress Point's condominiums.[4]

During construction of Cypress Point, the developer was issued four CGL policies by Evanston Insurance Company ("Evanston") covering the time period from May 30, 2002 to July 15, 2006, and three by Crum & Forster Specialty Insurance

---

[2] According to the complaints filed with the trial court, Metro Homes "is a corporation which was the co-sponsor, co-developer and/or general contractor that created, coordinated, designed and constructed the Association's building, units and common elements."

[3] According to the complaints filed with the trial court, Commerce Construction "is a construction/project management firm that was responsible for overseeing the construction of the Association's building, units, and common elements."

[4] When a condominium is developed, the condominium association is initially controlled by the developer; as units are sold, control of the association must transfer from the developer to the unit owners.  N.J.S.A. 46:8B-12.1.

5

Company ("Crum & Forster"), covering the time period from July 15, 2006 to July 15, 2009 (collectively, "the policies"). The policies, which are modeled after the standard form CGL policy promulgated by the Insurance Services Office, Inc. ("ISO"),[5] provide coverage for "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . caused by an 'occurrence' that takes place in the 'coverage territory' . . . [and] . . . occurs during the policy period."

Pursuant to the terms of the policies, "property damage" includes "[p]hysical injury to tangible property including all resulting loss of use of that property." An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The policies also contain "[v]arious provisions [that] . . . restrict coverage[,]" including an exclusion for "Damage to Your Work" ("the 'your work' exclusion"), which eliminates coverage for "'[p]roperty damage' to 'your work' arising out of

_____

[5] "ISO is an influential organization within the insurance industry that promulgates standard form insurance policies, including CGL policies, that insurers across the country use to conduct their business." Christopher C. French, Construction Defects: Are They 'Occurrences'?, 47 Gonz. L. Rev. 1, 5 n.7 (2011-12) (citing U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 879 n.6 (Fla. 2007)). Most CGL insurance policies in the United States are written on standard forms developed by ISO and made available with state insurance regulators. Ibid.

it or any part of it and included in the 'products-completed operations hazard.'"[6]  Notably, this exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on [the insured's] behalf by a subcontractor."[7] (Emphasis added).

After completion of the condominium complex and transfer of control to the Association, several condominium owners began experiencing problems, such as roof leaks and water infiltration at the interior window jambs and sills of the residential units. The Association also became aware of damage caused by water intrusion into the common areas and interior structures of Cypress Point.  As a result, the Association brought an action against the developer and several subcontractors.  It alleged faulty workmanship during construction, including but not limited to, defectively built or installed roofs, gutters, brick facades, exterior insulation and finishing system siding,

---

[6] Under the policies, "products-completed operation hazard" "[i]ncludes all 'bodily injury' and 'property damage' occurring" off-site and/or after the project is deemed "completed."

[7] The policies define "[y]our work" as "[w]ork or operations performed by you or on your behalf . . . and . . . [m]aterials, parts or equipment furnished in connection with such work or operations."  "Your work" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work' . . . and . . . [t]he providing of or failure to provide warnings or instructions."

windows, doors, and sealants.  The Association claimed consequential damages, consisting of, among other things, damage to steel supports, exterior and interior sheathing and sheetrock, and insulation, to Cypress Point's common areas, interior structures, and residential units ("the consequential damages").[8]

After the Association filed suit, Adria Towers requested that Evanston defend and indemnify it against the Association's claims.  When Evanston refused, and Adria Towers failed to file a declaratory judgment action against Evanston, the Association filed an amended complaint, seeking a determination whether its claims against the developer were covered by Evanston's CGL policies.  Evanston subsequently filed an amended answer to the Association's complaint, denying any obligation to defend and indemnify the developer, as well as a third-party complaint against Crum & Forster, alleging that if Evanston did owe such an obligation, the rights and responsibilities under the Crum & Forster CGL policies should also be adjudicated.

---

[8] In the complaint, which was amended several times between 2010 and 2012 to add claims and parties, the Association asserted claims of negligence, breach of express warranties, breach of implied warranties, negligent misrepresentation, violations of the Planned Real Estate Development Full Disclosure Act, and breach of contract.

Evanston and Crum & Forster (collectively, "the insurers") filed motions for summary judgment, arguing, among other things, that they were not liable because the subcontractors' faulty workmanship did not constitute an "occurrence" that caused "property damage" as defined by the policies. The trial court agreed, concluding that faulty workmanship does not constitute an "occurrence" and that the consequential damages caused therefrom were not "property damage" under the terms of the policies because the damage arose entirely from faulty work performed by or on behalf of the developer. Accordingly, the trial court granted Evanston's motion for summary judgment and dismissed Crum & Forster's motion for summary judgment as moot. The Association filed a motion for reconsideration, which was denied.

In a published opinion, the Appellate Division reversed the trial court's grant of summary judgment in favor of the insurers, holding that "unintended and unexpected consequential damages [to the common areas and residential units] caused by the subcontractors' defective work constitute 'property damage' and an 'occurrence' under the [CGL] polic[ies]." Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C., 441 N.J. Super. 369, 373 (App. Div. 2015). The panel found that, under the plain language of the CGL policies, the damages alleged in the Association's claim satisfied the policies' definitions of

9

"property damage" and "occurrence." Id. at 375-77. The panel also distinguished two prior New Jersey cases relied upon by the trial court in finding for the insurers, Weedo v. Stone-E-Brick, Inc., 81 N.J. 233 (1979), and Firemen's Insurance Co. of Newark v. National Union Fire Insurance Co., 387 N.J. Super. 434 (App. Div. 2006), "because they (1) involved only replacement costs flowing from a business risk, rather than consequential damages caused by defective work; and (2) interpreted different language than the policy language in this appeal," which was based on the 1986 standard CGL form rather than the 1973 version at issue in Weedo and Firemen's. Cypress Point, supra, 441 N.J. Super. at 377.

Thereafter, we granted the insurers' petitions for certification. 223 N.J. 355 (2015).

II.

The pertinent contentions of the parties are as follows. The insurers urge this Court to overturn the Appellate Division's finding that the policies provided coverage for the Association's claims against the developer. Citing Weedo and Firemen's, the insurers argue that the panel's holding conflicts with established law that CGL policies are only intended to provide coverage for damage caused by faulty workmanship to other property and not to the project itself, as was the case here. In doing so, the insurers assert, the panel improperly

10

shifted the risks inherent in constructing a building from the developer and general contractor, who are in the best position to control a subcontractor's work, to their insurers.

The insurers further contend that the Appellate Division failed to apply the correct definition of "accident" as it relates to a covered "occurrence" under the policies. According to the insurers, a subcontractor's faulty workmanship does not have the fortuity element required for the faulty workmanship to constitute an "accident," and is therefore not an "occurrence" under the terms of the policies. In other words, damage to any portion of the project caused by defective construction is not accidental because it is one of the normal, frequent, and predictable consequences of the construction business.

Relatedly, the insurers assert that the panel inappropriately invoked the "subcontractor exception" to the "your work" exclusion to trigger coverage for the Association's claims against the developer. According to the insurers, there was no coverage because faulty workmanship is not "property damage" or an "occurrence" under the terms of the policies and, therefore, the panel should not have considered whether the policies' exclusions, let alone exceptions to those exclusions, apply here.

Finally, the insurers ask us to follow authority from other jurisdictions, which they claim supports the proposition that

11

CGL policies do not provide coverage for faulty workmanship that causes damage to any portion of the work that the insured was obligated to deliver.  See, e.g., Columbia Ins. Grp., Inc. v. Cenark Project Mgmt. Servs., 2016 Ark. 185 (Ark. 2016).

The Association, conversely, asserts that the Appellate Division's ruling in favor of coverage for the consequential damages caused by a subcontractor's faulty workmanship is in line with both judicial precedent and the plain language of the policies.  Citing to Weedo, Firemen's, and S.N. Golden Estates, Inc. v. Continental Casualty Co., 293 N.J. Super. 395 (App. Div. 1996), the Association contends that our courts have consistently found that, while a construction defect itself is not covered under a CGL policy, the damage caused as a consequence of the defect is covered.  Thus, plaintiff argues that consequential damages stemming from faulty workmanship constitute a covered "occurrence" under the terms of the policies, and that the Appellate Division's holding supporting such an interpretation should not be disturbed.

The Association also notes that the Weedo and Firemen's decisions were based on the 1973 ISO form CGL policy, whereas the instant case involves the 1986 ISO form CGL policy, which contains a subcontractor exception to the "your work" exclusion that was not included in the 1973 ISO form.  The Association argues that the existence of the subcontractor exception implies

12

that the policies' definition of an "occurrence" includes construction defect claims, because interpreting the contract otherwise would render the subcontractor exception meaningless.

Finally, this Court granted leave to appear as amicus curiae to five entities or groups of entities: Associated General Contractors of America and Associated Construction Contractors of New Jersey; the Community Association Institute; the National Association of Home Builders, New Jersey Builders Association, and Leading Builders of America; Turner Construction Company; and United Policyholders. All five amici support the Association's positions.

### III.

### A.

We begin our discussion of the law applicable to this appeal by noting that we review the trial court's grant of summary judgment de novo under the same standard as the trial court. Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012). That standard commands that summary judgment be entered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). When no issue of fact exists, and only a question of law

13

remains, this Court affords no special deference to the legal determinations of the trial court. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Because there is no genuine issue of material fact before us, we review de novo the trial court's conclusion that the insurers were not obligated to defend and indemnify the developer against the Association's claims.

B.

With that standard in mind, we turn to the general principles governing the interpretation of insurance policies, which we have long recognized must be analyzed under the rules "of simple contract law," Kampf v. Franklin Life Ins. Co., 33 N.J. 36, 43 (1960), requiring us "to read the document as a whole in a fair and common sense manner," Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009).

Well-settled contract law provides that "[c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (citations and internal quotation marks omitted). Thus, "[w]hen the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties." Kampf, supra, 33 N.J. at 43 (citation omitted). It follows that

14

"[i]n attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route," Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008), and that when "the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect," Manahawkin, supra, 217 N.J. at 118 (citations and internal quotation marks omitted).  However, "[w]hen the provision at issue is subject to more than one reasonable interpretation, it is ambiguous, and the 'court may look to extrinsic evidence as an aid to interpretation.'"  Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 200 (2016) (quoting Chubb Custom, supra, 195 N.J. at 238).

As to insurance contracts specifically, "the general rule of construction [is] that if the controlling language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied."  Butler v. Bonner & Barnwell, Inc., 56 N.J. 567, 575 (1970) (citing Mazzilli v. Accident & Cas. Ins. Co., 35 N.J. 1, 7 (1961)); see also Doto v. Russo, 140 N.J. 544, 556 (1995) (noting that "New Jersey courts often have construed ambiguous language in insurance policies in favor of the insured and against the insurer").  Moreover, "[w]hile specific words may not be ambiguous, the context in which they are used may create

15

an ambiguity.  The court's responsibility is to give effect to the whole policy, not just one part of it."  Arrow Indus. Carriers, Inc. v. Cont'l Ins. Co. of N.J., 232 N.J. Super. 324, 334 (Law Div. 1989) (citing Boswell v. Travelers Indem. Co., 38 N.J. Super. 599, 604 (App. Div. 1956)).

C.

Having reviewed our jurisprudence on the interpretation of insurance policies, we turn to CGL policies, generally, with a special emphasis on the CGL policy at issue here.  A CGL policy "protects business owners against liability to third-parties." 3 Jeffrey E. Thomas, New Appleman on Insurance, Law Library Edition § 16.02[3][a][i], LexisNexis (2015) (Appleman).  The policy was first developed in the 1940s as "the result of a voluntary effort in the insurance industry to address the misunderstanding, coverage disputes, and litigation that resulted from the unique language used by each liability insurer."  U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877-78 (Fla. 2007) (citations omitted).  In 1966, the ISO CGL policy was "broadened to cover 'occurrences,' which included coverage for both 'accidents' and 'continuous exposure to conditions.'  This change permitted coverage for accidental events that were not abrupt and short-lived, such as seepage and long-term exposure to hazardous substances."  Appleman, supra, § 16.02[3][a][iv].

16

The most commonly purchased CGL policy is the standard form CGL policy, which "is revised every few years by the [ISO]." Id. at § 16.02[3][a][iii]. Although not required to do so, most insurers prepare their CGL policies based on the ISO's standard forms. Id. at § 16.02[3][a][iv].

Since 1966, the ISO has promulgated two standard form CGL policies, one in 1973 and another in 1986. As the Appellate Division aptly noted, there are important differences between the 1973 and 1986 standard form CGL policies which are of particular importance in the instant dispute. "First . . .[t]he 1973 ISO [policy] defines 'occurrence' as 'an accident . . . which results in . . . property damage neither expected nor intended from the standpoint of the insured'" while the 1986 ISO "policy defines 'occurrence' as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'" Cypress Point, supra, 441 N.J. Super. at 379 (internal citations omitted). Thus, "'[p]roperty damage,' . . . is not directly included in the policy's definition of 'occurrence.'" Id. at 379-80. "Second and most importantly, the 1986 ISO [policy] includes a significant exception to an exclusion not contained in the 1973 ISO [policy]." Id. at 380.

The exception in the 1986 ISO CGL policy, which has never been directly addressed by this Court, is found under the "your

17

work" exclusion clause of the policy. As outlined above, the 1986 standard form CGL policy eliminates coverage for "'property damage' to 'your work' arising out of it or any part of it . . ."[9] However, the policy's exception to this exclusion, included in the form by the ISO for the first time in 1986, provides that the "your work" exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Appleman, supra, §§ 18.03[12][a], [d].

In creating the subcontractor exception to the "your work" exclusion, it has been noted that the ISO was motivated by an agreement between policy holders and insurers

> that the CGL policy should provide coverage for defective construction claims so long as the allegedly defective work had been performed by a subcontractor rather than the policyholder itself. This resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL was a more attractive product that could be better sold if it contained this coverage.
>
> [Christopher C. French, Construction Defects: Are They 'Occurrences'?, 47 Gonz. L. Rev. 1, 8-9 (2011-12) (citation omitted).]

---

[9] In the 1973 ISO Form, the "your work" exclusion was worded slightly differently: "[t]his insurance does not apply . . . to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." Weedo, supra, 81 N.J. at 241.

Moreover, the ISO itself addressed the addition of the subcontractor exception in a July 1986 circular, which "confirm[ed] that the 1986 revisions to the standard CGL policy . . . specifically 'cover[ed] damage caused by faulty workmanship to other parts of work in progress; and damage to, or caused by, a subcontractor's work after the insured's operations are completed.'" U.S. Fire, supra, 979 So. 2d at 879 (citing ISO Circular, Commercial Gen. Liab. Program Instructions Pamphlet, No. GL-86-204 (July 15, 1986)).

D.

We now turn to New Jersey's case law pertinent to interpreting CGL policies. In doing so, we note that the seminal cases considering whether construction defects are covered under such policies construed versions of the standard form ISO policy that predated the 1986 version used here.

This Court first addressed the issue of whether a standard CGL policy covers construction defects in Weedo, supra, which is regularly cited by both state and federal courts as the leading case on the issue. French, supra, 47 Gonz. L. Rev. at 22-24; see also Fireman's, supra, 387 N.J. Super. at 442 (noting that "[t]he seminal case regarding insurance coverage for a contractor's defective work is Weedo"). In Weedo, two sets of homeowners sued a masonry contractor, Stone-E-Brick, for claims arising out of faulty workmanship and defective construction

19

work.  Weedo, supra, 81 N.J. at 235-36.  In their complaints, the homeowners sought damages to cover the cost of correcting the construction defects.  Ibid.  Stone-E-Brick, in turn, requested that its CGL insurer defend and indemnify it against both complaints, but the insurer refused, asserting that CGL policies exclude coverage for claims of faulty construction that require repair or replacement of a contractor's work.  Id. at 236.

The policy at issue in Weedo was the 1973 version of the standard form CGL, which contained exclusions for "business risks" to the "'insured products' (exclusion '(n)') and 'work performed' (exclusion '(o)')," and read as follows:

> *   *   *   This insurance does not apply
>
> (n) to property damage to the named insured's products arising out of such products or any part of such products;
>
> (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.
>
> [Id. at 240-41.]

After engaging in an extensive discussion of the nature and purpose of "business risk" exclusions within CGL policies, and determining that "[t]he consequence of not performing well is part of every business venture[, and that] the replacement or repair of faulty goods and works is a business expense, to be

borne by the insured-contractor in order to satisfy customers," the Weedo Court rejected Stone-E-Brick's claim for coverage. Id. at 238-41. In doing so, the Court held that CGL policies did not indemnify insureds "where the damages claimed are the cost of correcting the [alleged defective] work itself[,]" id. at 235, but did not address whether the alleged faulty workmanship constituted a covered "occurrence" under the 1973 standard form CGL policy. See id. at 237 n.2 (noting that because insurer "conceded . . . that but for the exclusions in the policy, coverage would obtain," Court would "not address the validity of one of the carrier's initially-offered grounds of non-coverage, namely, that the policy did not extend coverage for the claims made even absent the exclusions"). Rather, the homeowners' claims seeking compensation for the repair and replacement of the insured's faulty work was specifically excluded and, therefore, the CGL insurer was not obligated to provide coverage. Id. at 241 (stating that "given the precise and limited form of damages which form the basis of the claims against the insured, either exclusion is, or both are, applicable to exclude coverage").

Building on the principles enunciated in Weedo, the Appellate Division in Fireman's, supra, held that claims against an insured general contractor for the cost of replacing sub-standard condominium firewalls installed by subcontractors did

21

not qualify as covered "property damage" caused by an "occurrence" under the 1973 ISO standard form CGL policy. 387 N.J. Super. at 446, 449. In reaching that conclusion, the panel noted that Weedo had distinguished between "two kinds of risks, one of which is excluded by the standard CGL policy and one of which is not": (1) "'business risk,' . . . the risk that the contractor's work may be faulty and may breach express or implied warranties"; and (2) "the risk of injury to people and damage to property caused by faulty workmanship." Id. at 442-43 (citing Weedo, supra, 81 N.J. at 239) (internal quotation marks omitted). "[T]he key distinction," according to the Firemen's panel, "is the predictability of the harm: damage for breach of contractual warranty is limited and is an expected cost of doing business; liability for injury or damage to a person or property is potentially 'almost limitless' and is 'entirely unpredictable.' The policy is designed to ensure against the latter risk." Id. at 443 (citing Weedo, supra, 81 N.J. at 239-40). Thus, because "the alleged damage was the cost of replacing sub-standard firewalls [and not] that the firewalls caused damage to the rest of the building or to any other person or property," the panel found that, under Weedo, the CGL insurer was not obligated to indemnify the insureds. Id. at 443, 445, 449 ("While Weedo addressed 'business risk' in the context of whether certain exclusions applied, the Weedo principle has been

22

extended to the threshold issue of whether the risk was within the scope of the standard insuring clause.").

E.

Because this Court has never addressed questions of coverage for consequential damages caused by faulty workmanship under the 1986 ISO standard form CGL policy, a brief review of other state and federal decisions that have considered this issue is instructive. See Weedo, supra, 81 N.J. at 241 ("Because of the factual similarity and the uniform wording of the exclusionary clauses [contained in standard form CGL policies], the reasoning in these decisions [from other jurisdictions] is thoroughly persuasive.").

In U.S. Fire, supra, the Supreme Court of Florida held that a subcontractor's defective work, which "is neither expected nor intended from the standpoint of the [insured] contractor[,] can constitute 'property damage' caused by an 'occurrence' as those terms are defined in a standard form [CGL] policy." 979 So. 2d at 875. There, after a contractor completed construction of several homes, the homeowners discovered that improper soil compacting and testing by subcontractors caused damage to the homes and the homeowners' personal property. Ibid. The contractor sought coverage for the damage under its CGL policies, but the insurer denied coverage for the costs of repairing the structural damage to the homes and only agreed to

23

indemnify the contractor for the damage caused to the homeowners' personal property.  Id. at 876.  The contractor sued the insurer, and the dispute reached the Supreme Court of Florida, which considered the issue of whether a 1986 standard form CGL policy "issued to a general contractor, provides coverage when a claim is made against the contractor for damage to the completed project caused by a subcontractor's defective work."  Id. at 877.

In finding that a subcontractor's faulty workmanship can constitute an "occurrence" under the 1986 ISO form, the court in U.S. Fire rejected the insurer's argument that faulty workmanship "can never be an 'accident' because it results in reasonably foreseeable damages," and noted that "a construction of the insuring agreement that precludes recovery for damage caused to the completed project by the subcontractor's defective work renders the . . . subcontractor exception to [the 'your work'] exclusion . . . meaningless."  Id. at 883, 887.  The court also rejected the insurer's argument that "faulty workmanship that injures only the work product itself does not result in 'property damage;'" observing that, "just like the definition of the term 'occurrence,' the definition of 'property damage' in the CGL policies does not differentiate between damage to the contractor's work and damage to other property."  Id. at 888-89.  Thus, the Court found that "faulty workmanship

24

or defective work that has damaged the otherwise nondefective completed project has caused 'physical injury to tangible property' within the plain meaning of the definition in the [1986 CGL] policy." Id. at 889.[10]

In French v. Assurance Co. of America, the Fourth Circuit Court of Appeals, applying Maryland Law, held that the 1986 standard form CGL policy provides coverage for damages caused by a subcontractor's faulty workmanship, but not for the cost of replacing and/or repairing the faulty workmanship itself. 448 F.3d 693, 704 (2006). French involved homeowners who sought coverage from a general contractor's CGL insurer after a subcontractor's negligently installed stucco caused moisture damage to their otherwise properly-built house. Id. at 696. When the CGL insurer refused to indemnify the insureds for either the cost of replacing the stucco or the damages resulting from the faulty workmanship, the homeowners sued. Ibid. After acknowledging that the subcontractor exception "restored otherwise excluded coverage for damage caused to construction

---

[10] Interestingly, and of particular relevance to this Court, the U.S. Fire Court also explicitly distinguished its finding from the holding in Weedo, supra, 81 N.J. 233, holding that Weedo's determination that there was no coverage for faulty workmanship by a subcontractor was based on specific exclusions in the pre-1986 ISO form, and not on the definitions of "property damage" or "occurrence" within the policy itself. U.S. Fire, supra, 979 So. 2d at 881-82.

25

projects by subcontractor negligence," the Court determined that the standard form 1986 CGL policy precludes coverage to a general contractor to replace or repair defective workmanship performed by a subcontractor but does provide coverage for the damages resulting from the subcontractor's faulty workmanship. Id. at 704, 706. Accordingly, the Fourth Circuit found that the subcontractor exception to the "your work" exclusion required the CGL insurer to "provide[] liability coverage for the cost to remedy unexpected and unintended property damage to the contractor's otherwise nondefective work-product caused by the subcontractor's defective workmanship." Id. at 706.

Although the holdings in U.S. Fire and French are not controlling here, they are informative because they represent "a strong recent trend in the case law [of most federal circuit and state courts] interpet[ing] the term 'occurrence' to encompass unanticipated damage to nondefective property resulting from poor workmanship." Greystone Constr. v. Nat'l Fire & Marine Ins. Co., 661 F.3d 1272, 1282-83, 1286 (10th Cir. 2011) (recognizing body of case law "generally hold[ing] that damage caused by faulty workmanship is neither expected nor intended from the standpoint of the policyholders and, therefore, receives coverage so long as it does not fall under a policy exclusion" and finding that "when a subcontractor's faulty workmanship causes unexpected property damage to otherwise

26

nondefective portions of the builder's work, [CGL] policies provide coverage"); see also Sheehan Constr. Co. v. Cont'l Cas. Co., 935 N.E.2d 160, 169-71 (Ind.) (adopting view that 1986 CGL policy covers property damage caused by subcontractor's unexpected and unintended faulty workmanship), modified on other grounds, 938 N.E.2d 685 (Ind. 2010); Architex Ass'n v. Scottsdale Ins. Co., 27 So. 3d 1148, 1162 (Miss. 2010) (finding 1986 CGL "policy unambiguously extends coverage to [insured general contractors] for unexpected or unintended 'property damage' resulting from negligent acts or conduct of a subcontractor, if not excluded by other applicable terms and conditions of the policy"); Travelers Indem. Co. of Am. v. Moore & Assocs., Inc., 216 S.W.3d 302, 309 (Tenn. 2007) (concluding that water damage resulting from subcontractor's faulty window installation constitutes "both an 'accident' and an 'occurrence' for which there is coverage under" the 1986 standard form CGL policy); Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 16 (Tex. 2007) (explaining that "claims for damage caused by an insured's defective performance or faulty workmanship may constitute an 'occurrence' when 'property damage' results from the 'unexpected, unforeseen or undesigned happening or consequence' of the insured's negligent behavior") (citation and quotation marks omitted); Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65, 70 (Wis. 2004) (holding subcontractor's

27

faulty workmanship, which caused building's foundation to sink, was "property damage" caused by "occurrence").

IV.

A.

We now turn to the merits of the instant dispute, which requires that we determine whether the policies issued by the insurers to the developer provide coverage for the Association's claims of consequential water damage caused by the subcontractors' faulty workmanship.  In answering this question we follow a three-step process.  First, we examine the facts of the Association's claims to ascertain whether the policies provide an initial grant of coverage.  If so, the second step considers whether any of the policies' exclusions preclude coverage.  Finally, in step three, we determine whether an exception to a pertinent exclusion applies to restore coverage.[11]

As previously stated, the policies at issue insure against liability for "property damage" that "is caused by an 'occurrence.'"  "Property damage" is defined as:

> a. Physical injury to tangible property including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

---

[11] The three-step analytical framework we use here is informed by the process employed by the Wisconsin courts.  See Design Basics LLC v. J&V Roberts Inv., Inc., 130 F. Supp. 3d 1266, 1285 (Wis. 2015) (citing Am. Girl, Inc., supra, 673 N.W.2d at 73).

28

　　　　b. Loss of use of tangible property that is not
　　　　　　physically injured.  All such loss of use
　　　　　　shall be deemed to occur at the time of the
　　　　　　"occurrence" that caused it.

Here, the Association alleged that water infiltration, occurring after the project was completed and control was turned over to the Association, caused mold growth and other damage to Cypress Point's completed common areas and individual units. Those post-construction consequential damages resulted in loss of use of the affected areas by Cypress Point residents and, we hold, qualify as "[p]hysical injury to tangible property including all resulting loss of use of that property." Therefore, on the record before us, the consequential damages to Cypress Point were covered "property damage" under the terms of the policies.

Next, the policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The term "accident" is not defined in the policies.  Thus, we must first give meaning to the term "accident" in order to address the threshold question whether the subcontractors' faulty workmanship, and the damages that flowed therefrom, constitute an "occurrence" triggering an initial grant of coverage for the Association's claims.

When interpreting undefined terms within an insurance policy, we "resort to the general rule that the terms in an

29

insurance policy should be interpreted in accordance with their plain and commonly-understood meaning." Morton Int'l v. Gen. Accident Ins. Co., 134 N.J. 1, 56 (1993) (citation omitted); Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537 (1990) ("[T]he words of an insurance policy should be given their ordinary meaning[.]"). This common-sense approach often begins with an examination of dictionary definitions.

Merriam-Webster's dictionary defines "accident" as "an unforeseen and unplanned event or circumstance." Merriam-Webster's Collegiate Dictionary 1419 (11th ed. 2012); see also Black's Law Dictionary 18 (10th ed. 2014) (explaining that "[t]he word 'accident,' in accident policies, means an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental."). A leading treatise on New Jersey insurance law tracks substantially the same language as the dictionary definition for "accident":

> An unintended or unexpected event. An accident is an event or condition occurring by chance or arising from unknown or remote causes; an unforeseen, unplanned event or condition; a usually sudden event or change occurring without intent or volition, through carelessness, unawareness, ignorance, or the like; an unexpected happening causing loss or injury not due to fault or misconduct of the person injured which may form the basis for legal relief.

30

[George J. Kenny & Frank A. Lattal, New Jersey Insurance Law app'x A (2d ed. 2000) (citing Prop. Cas. Co. of MCA v. Conway, 147 N.J. 322, 327 (1997) (defining "accident" for purposes of determining whether homeowner's insurance policy covers parent's vicarious liability for child's vandalism of school)) (additional citations omitted).]

Although we have yet to define the term "accident" in a CGL policy, this Court has considered the word in the context of a homeowner's insurance policy in two prior cases where, as here, coverage was limited to damage caused by an "occurrence," which was defined as an "accident." In Property Casualty Co., supra, the Court found that the "ordinary meaning" of the term "accident" is "an unintended or unexpected event." 147 N.J. at 327, 330 (holding that homeowner's insurance provides coverage for parent's vicarious liability for child's vandalism of school). In Voorhees v. Preferred Mutual Insurance Co., in which the underlying action was a defamation suit brought by a teacher against a parent, we determined "that the accidental nature of an occurrence is determined by analyzing whether the alleged wrongdoer intended or expected to cause an injury." 128 N.J. 165, 183 (1992). Thus, we held that if the alleged wrongdoer did not intend or expect to cause an injury, then "the resulting injury is 'accidental.'" Ibid.

Based on those guiding principles, we find that the term "accident" in the policies at issue encompasses unintended and

31

unexpected harm caused by negligent conduct.  That construction

of the term "accident" as it relates to an "occurrence" in a CGL

policy aligns with both the commonly accepted definitions of

"accident" and the legal import given to the term by both this

and other jurisdictions.  See, e.g., Greystone, supra, 661 F.3d

at 1284 (finding "the term 'accident' . . . incorporates [both]

a 'fortuitous event,' and 'an unanticipated or unusual result

flowing from a commonplace cause'") (internal citations

omitted); Sheehan Constr., supra, 935 N.E.2d at 170 ("Implicit

in the meaning of "accident" is the lack of intentionality.");

Travelers, supra, 216 S.W.3d at 308 ("[C]onclud[ing] that the

term 'accident' as used in the [1986] CGL [policy] means 'an

unforeseen or unexpected event' . . . consider[ed] . . . from

the perspective of the insured."); Am. Girl, Inc., supra, 673

N.W.2d at 76 (finding "accident" and therefore "occurrence"

where "[n]either the cause nor the harm was intended,

anticipated, or expected").

Applying our definition, we must now determine whether the

consequential water damage to the completed, nondefective

portions of Cypress Point flowing from the subcontractors' poor

workmanship was foreseeable.  Here, no one claims that the

subcontractors intentionally performed substandard work that led

to the water damage.  Rather, relying on Weedo, the insurers

assert that damage to an insured's work caused by a

32

subcontractor's faulty workmanship is foreseeable to the insured developer because damage to any portion of the completed project is the normal, predictable risk of doing business. Thus, in the insurers' view, a developer's failure to ensure that a subcontractor's work is sound results in a breach of contract, not a covered "accident" (or "occurrence") under the terms of the policies. We disagree.

To begin with, defendant's argument that a breach of contract cannot give rise to a covered "occurrence" ignores the question of initial coverage. Indeed, as the Wisconsin Supreme Court highlighted in Am. Girl, Inc., supra,

> [while] CGL policies generally do not cover contract claims arising out of the insured's defective work or product, . . . this is by operation of the CGL's business risk exclusions, not because a loss actionable only in contract can never be the result of an "occurrence" within the meaning of the CGL's initial grant of coverage. This distinction is sometimes overlooked, and has resulted in some regrettably overbroad generalizations about CGL policies in our case law.

> [673 N.W.2d at 76 (emphasis added).]

See also U.S. Fire, supra, 979 So. 2d at 884 (rejecting CGL insurer's "argument that a breach of contract can never result in an 'accident,'" because such an assertion "is not supported by the plain language of the policies").

Moreover, the insurers' argument fails to recognize that Weedo and its progeny were decided based upon exclusions

33

contained within the pre-1986 CGL policy, rather than an interpretation of the policy's terms granting coverage in the first instance. See Travelers, supra, 216 S.W.3d at 307 (noting that "Weedo . . . is [not] relevant to the determination of whether there has been an 'occurrence' under the terms of the 'insuring agreement'" because "[i]n Weedo, the insurer conceded that the 'insuring agreement' granted coverage and asserted that the sole issue . . . was whether the 'exclusions' precluded coverage" (citing Weedo, supra, 81 N.J. at 237 n.2)) (emphasis added); Am. Girl, Inc., supra, 673 N.W.2d at 77 (same).

In any event, under our interpretation of the term "occurrence" in the policies, consequential harm caused by negligent work is an "accident." Therefore, because the result of the subcontractors' faulty workmanship here -- consequential water damage to the completed and nondefective portions of Cypress Point -- was an "accident," it is an "occurrence" under the policies and is therefore covered so long as the other parameters set by the policies are met. See Weedo, supra, 81 N.J. at 249 (noting that CGL policies do "not cover an accident of faulty workmanship but rather faulty workmanship that causes an accident").

B.

Having determined that the Association's claims are covered under the policies' general insuring agreement, we next turn to

the final two steps in our analysis in which we examine the policies' pertinent exclusions and then, if applicable, any exceptions to those exclusions.  In doing so, our "responsibility is to give effect to the whole policy, not just one part of it."  Arrow Indus., supra, 232 N.J. Super. at 334 (citing Boswell, supra, 38 N.J. Super. at 604); see also Herbert L. Farkas Co. v. N.Y. Fire Ins. Co., 5 N.J. 604, 610 (1950) (reinforcing principal that insurance policies "must be considered as a whole and effect given to every part thereof").  "In addition, we must also be mindful of the corollary rule of construction that if the clause in question is one of exclusion or exception designed to limit the protection afforded by the general coverage provisions of the policy, a strict interpretation is in order."  Bello v. Hurley Limousines, 249 N.J. Super. 31, 40-41 (1991) (citing Butler, supra, 56 N.J. at 574; Mazzilli, supra, 35 N.J. at 7-8).

The policies at issue here, like those in Weedo and Firemen's, contain numerous exclusions eliminating coverage for a variety of business risks including the cost of repairing damage to the contractor's own work -- the "your work" exclusion.  See Weedo, supra, 81 N.J. at 241; Firemen's, supra, 387 N.J. Super. at 441.  As outlined above, the "your work" exclusion precludes coverage under the policies for "'property damage' to 'your work' arising out of it or any part of it."

35

Thus, under the second step of our three-part analysis, and viewing that exclusion in isolation, the policies would seem to eliminate coverage for the water damage to the completed sections of Cypress Point.

However, the "your work" exclusion contains an important exception that "narrow[s] the exclusion by expressly declaring that it does not apply 'if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.'" Sheehan Constr., supra, 935 N.E.2d at 171 (quoting 1986 ISO standard form CGL policy). This exception to the "your work" exclusion was not contained in the 1976 ISO CGL form, but unquestionably applies in this case. Accordingly, the third and final step of our inquiry compels the conclusion that, because the water damage to the completed portions of Cypress Point is alleged to have arisen out of faulty workmanship performed by subcontractors, it is a covered loss.

Indeed, as courts and commentators have acknowledged, the 1986 ISO standard form CGL policy's inclusion of the "subcontractor exception" "resulted both because of the demands of the policyholder community (which wanted this sort of coverage) and the view of insurers that the CGL [policy] was a more attractive product that could be better sold if it contained this coverage." French, supra, 47 Gonz. L. Rev. at 8-9 (citation omitted); see also Greystone, supra, 661 F.3d at

36

1287 (noting that "the evolution of CGL-policy language shows that the current standard-form policy, which was used in the present case, was specifically designed to provide general contractors with at least some insurance coverage for damage caused by the faulty workmanship of their subcontractors"); Lamar Homes, supra, 242 S.W.3d at 12 ("By incorporating the subcontractor exception into the 'your-work' exclusion, the insurance industry specifically contemplated coverage for property damage caused by a subcontractor's defective performance."). Moreover, the ISO itself addressed the addition of the subcontractor exception in a July 1986 circular, which "confirm[ed] that the 1986 revisions to the standard CGL policy . . . specifically 'cover[ed] damage caused by faulty workmanship to other parts of work in progress; and damage to, or caused by, a subcontractor's work after the insured's operations are completed.'" U.S. Fire, supra, 979 So. 2d at 879 (citing ISO Circular, Commercial Gen. Liab. Program Instructions Pamphlet, No. GL-86-204 (July 15, 1986)).

Furthermore, we agree with other courts that "if the insurer decides that this is a risk it does not want to insure, it can clearly amend the policy to exclude coverage, as can be done simply by either eliminating the subcontractor exception or adding a breach of contract exclusion." Id. at 891; Greystone, supra, 661 F.3d at 1288 ("Insurers are of course free to amend

37

CGL agreements or offer riders so as to reallocate the risk of subcontractor negligence."). The insurers here chose not to negotiate away the subcontractor exception and instead issued the developer a series of 1986 ISO standard form CGL policies which explicitly provide coverage for property damage caused by a subcontractor's defective performance. Thus, the Association's claims of consequential damages caused by the subcontractors' faulty workmanship are covered not only by the insuring agreements' initial grant of coverage but also by the subcontractor exception to the "your work" exclusion.

As a final note, we decline to address the issue raised by the Appellate Division of whether the subcontractor exception in the policies created a "reasonable expectation" that "consequential damages caused by the subcontractors' faulty workmanship constituted 'property damage' and an 'occurrence[,]'" in light of our finding that the policy unambiguously provides coverage in such instances. See Di Orio v. New Jersey Mfrs. Ins. Co., 79 N.J. 257, 269-70 (observing that where insurance policy's provision is not ambiguous or otherwise misleading, courts need not consider "objectively reasonable expectation" of average policyholder in interpreting the policy). In any event, to the extent that the parties interpret the term "accident" in the policy differently, thereby raising the specter of ambiguity within the policy itself, we

38

note that such ambiguities are to be read in favor of the insured, not the insurer.  See Doto, supra, 140 N.J. at 556 (noting "the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing" in case addressing coverage under commercial-umbrella liability policy (citing State v. Signo Trading Int'l, 130 N.J. 51, 62 (1992))).

In sum, we hold that the trial court erred in entering summary judgement in favor of the insurers because the Association's claims of consequential water damage resulting from defective workmanship performed by subcontractors constitutes both an "occurrence" and "property damage" under the terms of the policies.

V.

The judgment of the Appellate Division is affirmed and the matter is remanded to the trial court for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA join in JUSTICE SOLOMON's opinion. JUDGE CUFF (temporarily assigned) did not participate.