**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4234-17T3

BIJOU VILLA CONDOMINIUM
ASSOCIATION, INC.,

     Plaintiff-Appellant,

v.

E.A. KING, INC. and ED KING,

     Defendants-Respondents.

_____

Argued February 27, 2019 – Decided May 1, 2019

Before Judges Koblitz, Currier, and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-4146-14.

Gregg S. Sodini argued the cause for appellant (Cutolo Barros, LLC, attorneys; Joseph A. Kutschman and Gregg S. Sodini, on the briefs).

Joseph C. Valenzuela argued the cause for respondents (Golden, Rothschild, Spagnola, Lundell, Boylan & Garubo, PC, attorneys; Audrey L. Shields, of counsel and on the brief; Joseph C. Valenzuela, on the brief).

PER CURIAM

After sustaining damage to its property caused by flooding during Superstorm Sandy (Sandy), plaintiff Bijou Villa Condominium Association, Inc. filed a complaint against defendants, alleging they failed to obtain sufficient flood insurance coverage. The trial court barred plaintiff's expert reports as an inadmissible net opinion and granted summary judgment to defendants. We affirm.

Plaintiff manages and maintains the two-building seventy-unit condominium complex located next to the Shark River in Neptune, New Jersey. Defendant Ed King and his wife Kathy[1] owned a condominium in the complex from 1984 to 1998. Ed served as president of plaintiff's board of directors (board) from 1987 to 1993. Kathy took over as president of the board in 1993 and acted as plaintiff's de facto property manager from 1993 to 1996. Subsequently, Kathy worked for Access Property Management and was assigned as plaintiff's property manager from 2003 to 2007. During that time, Kathy also managed eight to ten other properties. Patricia Boyce managed the property from 2007 to 2009 and again from 2010 to 2014.

---

[1] For clarity and ease of the reader, we refer to the Kings by their first names.

A-4234-17T3

Ed founded defendant E.A. King, Inc. (the agency), an insurance agency authorized to do business in New Jersey. He and Kathy are the agency's two directors. Ed is licensed in New Jersey to sell life, health, property, and casualty insurance. Kathy is not a licensed insurance broker and was described by Ed as not "really hav[ing] a role" in the agency.

Prior to forming the agency in 1991, Ed was employed by an insurance broker as a producer or account executive and sold insurance. In 1986, the board asked Ed to help with their insurance needs. He remained plaintiff's insurance broker for property and liability insurance until 2008, and handled the flood insurance policies until 2013. From 2003 to 2013, Ed's contact person regarding plaintiff's insurance policies was the property manager – Kathy, and then Boyce.

Kathy recalled that she "did not have to procure any [new] insurance" policies during her tenure as property manager because the policies were already in place. When it was time to renew a policy, she would obtain quotes for the renewal, and pass along any information she received to the board for its review. Copies of insurance policies were also provided to the board.

In January 2004, Ed sent Kathy a letter, as plaintiff's property manager, advising that plaintiff's flood insurance was set to renew the following month. The letter stated the amount of coverage at that time was $250,000 per building

A-4234-17T3

and warned "this is not nearly enough coverage should a serious flood do severe damage to the buildings. [Plaintiff] would be facing serious co-insurance penalties.[2] Higher limits are available but they will be costly." Kathy gave Ed's letter to the board, explained to them what co-insurance penalties were, and offered to bring Ed to a board meeting to further explain his letter. The board did not ask Kathy any questions about the letter or request Ed's attendance at a meeting. However, the board did increase the flood insurance coverage to $332,800 per building for the 2004-2005 policy period.

Krista Simpkins, a board member from 2005 to 2015, testified she recalled asking Kathy whether plaintiff had sufficient flood insurance. In response to Kathy's inquiry to him, Ed sent the following August 2006 letter stating:

> Under the property policy, the buildings . . . are insured for slightly over $6,000,000. The flood policies only have $250,000 on each of the buildings. You should insure to at least [eighty percent] of the replacement

---

[2] Ed explained the term "co-insurance penalty" during his deposition.

> Let's say, for example, you have a building and replacement cost is $100,000 and you insure it for $50,000, but you don't want to spend the extra money, you have a loss for $40,000, partial loss. The company can come to you, you should have insured it for 100, you insured it for . . . 50 percent. Therefore, you have a loss of $40,000, we're going to give you 50 percent of that, here's a check for $20,000. That's the penalty.

cost which would be $4.8 million or $2.4 million on each building.

Currently $250,000 represents only [ten percent] of what you should be insuring for. In the event of a loss by flood, [plaintiff] could be facing a severe co-insurance penalty. Simply, if you had a $100,000 loss, the flood insurance company would only pay [plaintiff] the same [ten percent] or $10,000. To insure to the proper value, the entire flood premium would be approximately $10,300 — which is an increase of $5,900 over what you are currently paying.

After Kathy provided the board with Ed's letter, it agreed to further increase its insurance coverage, and Kathy contacted the agency for a quote.

In January 2007, the agency sent plaintiff a quote for the premium cost to increase the coverage to $1,000,000 on each building. Kathy wrote a note on the letter in February stating, "[p]lease increase coverage immediately as per [b]oard of [d]irectors." At her deposition, Kathy described the board's discussion of Ed's letter, including the letter's recommendations, and the board's subsequent decision to gradually increase the coverage due to financial constraints, as opposed to procuring the suggested $2.4 million for each building. The policy for 2007-2008 reflects coverage for each building of $1,000,000.

Simpkins testified that she was "shocked" when the board received Ed's August 2006 letter advising plaintiff was "severely underinsured." She recalled

5

telling Kathy that the board wanted to be "fully insured for flood insurance." She stated she was "under the impression that [the flood coverage] was [eighty percent]" or "whatever the max number coverage was that was available." Simpkins did not recall any other conversations with Kathy or Ed about flood insurance. She never reviewed any of the flood insurance policies.

Sharon Mazza, a board member from 2007 to 2014, testified she only recalled one conversation regarding flood insurance. In 2007, she remembered a discussion concerning the need for plaintiff to increase its flood insurance coverage. She stated: "There was a discussion, and as I recall, we increased it. What I don't recall is how much, if we did the full amount or partial." She did not recall how much of an increase the board agreed upon. She also did not recall reviewing any policies or declaration sheets for flood insurance, or if the board ever requested Ed to obtain higher limits of flood insurance.

Kathy recalled Ed advising her that the board needed an appraisal to determine the replacement cost of the buildings. Kathy stated she presented the information to the Board, but an appraisal was never done.

In 2008, when Ed delivered the flood insurance policies to Boyce, he told her plaintiff's flood coverage was insufficient. Thereafter, the board dealt directly with its flood insurer, and, using the insurer's renewal forms, plaintiff

6

increased its flood coverage in 2008-2009 to $1.1 million per building. The coverage remained the same for 2009-2010. For the 2010-2011 policy period, the board increased its flood coverage to $1.21 million per building, again through the insurer's flood insurance renewal forms. This was the coverage in place when Sandy occurred in October 2012.

After the storm, plaintiff filed a claim with its flood insurer for the flood damage to its property. The insurer determined both buildings were underinsured, as they were valued around $3.8 million and $3.6 million, but only insured for $1.2 million each. The insurer determined plaintiff should have insured each building for $3 million. As a result, plaintiff was subjected to a large co-insurance penalty, which reduced its claim payout by $450,000.

Consequently, plaintiff filed a complaint, alleging defendants failed to obtain full insurance coverage for its property, resulting in plaintiff incurring a co-insurance penalty and lessening the payout on its claim for damages caused by Sandy. During discovery plaintiff produced two expert reports from Wayne Citron.

Citron opined that defendants "had a duty to fully inform [plaintiff] of its flood insurance options," and plaintiff "should have been adequately covered for an amount of flood insurance commensurate with the value of the buildings."

A-4234-17T3

He concluded that defendants' failure to conduct themselves with the requisite standard of care required of a licensed insurance professional resulted in plaintiff being underinsured and denied plaintiff the full value of its loss after the storm.

The parties each moved for summary judgment. Defendants also argued plaintiff's expert reports should be barred as an inadmissible net opinion.

After hearing oral argument, Judge Jamie S. Perri issued a thorough and comprehensive oral opinion, granting defendants' motion and denying plaintiff's. In addressing Citron's expert reports, Judge Perri found he had not provided any "rule, recognized industry or professional standard, handbook, statute, or regulation" to support "his sweeping assumptions and opinions regarding [Ed's] actions in this matter." She remarked that Citron had ignored the undisputed evidence regarding the information and requests concerning flood insurance that transpired between the parties. Judge Perri concluded that "Citron's report represents nothing other than his personal opinions." Therefore, she barred the reports as a "net opinion."

The judge also considered plaintiff's argument that defendants owed it a heightened duty of care because the two parties had a "special relationship" based on Ed and Kathy's residency in the condominium and their service as

board presidents and property managers. Relying on Triarsi v. BSC Grp. Servs., LLC, 422 N.J. Super. 104, 116-17 (App. Div. 2011), Judge Perri found plaintiff's claim of a "special relationship" was not supported by the evidence. She noted: 1) plaintiff used another broker to procure its property and liability insurance in 2008; 2) "Ed provided the board with specific advice regarding the amount of flood insurance the board should carry and . . . the board chose not to follow the advice, [and] instead wished to raise its current limits to an amount less than Ed recommended"; 3) plaintiff failed to show that the board relied on defendants any differently than they would have on another broker; and 4) Ed and Kathy had stopped living at the condominium "well before the circumstances in question."

Judge Perri also considered whether plaintiff had demonstrated factual issues regarding a breach of the professional duty owed by defendants. She noted that, in response to a request from the board, Kathy obtained a quote for the agency to provide $1 million in coverage for each building. The agency responded to the request with a premium quote, which Kathy transmitted to the board. The board then authorized Kathy to accept the quote. The policy for 2007-2008 reflected the increased coverage — $1 million per building. Judge Perri stated: "There is no evidence or legal basis for a claim that a broker having

9

given a recommendation for coverage is obliged to debate the issue further with the client or refuse the client's request for an amount less than that which has been recommended." She further concluded "there is no evidence of any standard that [Ed] was required to repeat his warnings regarding . . . the inadequacy of coverage or the risk of a co-insurance penalty with each renewal."

Lastly, the judge addressed plaintiff's argument that "Kathy was acting as a dual agent both in her capacity as [plaintiff's] property manager and as a director of [the agency]." In rejecting the argument, the judge found: 1) Kathy was not an insurance broker and thus, could not be held to the standard of a broker; 2) Kathy's role as a director of the agency did not impose a professional duty on her to act as a dual agent; and 3) Kathy was acting on behalf of plaintiff as its property manager, and not on behalf of the agency when she "was tasked with conveying the board's request for a quote from [the agency] for flood insurance coverage [and] reporting the response back to the board."

Judge Perri granted summary judgment to defendants on September 21, 2017, and denied plaintiff's cross-motion. Thereafter, plaintiff moved for reconsideration, reiterating its arguments and additionally asserting that the trial court "erred in finding . . . no genuine issue of material fact exist[ed] about the exact level of coverage requested by the [board]."

A-4234-17T3

In a May 3, 2018 order, Judge Perri denied the motion, finding plaintiff had not provided any new information as to its previously asserted contentions. Addressing the argument she had erred in her conclusion regarding the coverage requested by the board, the judge stated:

> It was unnecessary for the court to determine whether the [b]oard conveyed to Kathy that it wanted . . . 'maximum coverage' because the chain of events in the factual record showed that the King defendants discharged their duty and provided the level of coverage requested by the [b]oard's property manager. Given that this was not a material issue of fact, the court was free to leave the question of whether the [b]oard had conveyed to Kathy . . . that it wanted 'maximum coverage,' unresolved.

We review a trial court's summary judgment disposition de novo based upon an independent review of the motion record, and applying the same standard as the trial court.  Townsend v. Pierre, 221 N.J. 36, 59 (2015).  A court should grant summary judgment if the record establishes there is "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  R. 4:46–2(c).

"When no issue of fact exists, and only a question of law remains, [we] afford[] no special deference to the legal determinations of the trial court."  Cypress Point Condo. Ass'n v. Adria Towers, LLC, 226 N.J. 403, 415 (2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378

11

(1995)).  However, "[p]urely legal questions . . . are questions of law particularly suited for summary judgment."  Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (citation omitted).  "If a case involves no material factual disputes, the court disposes of it as a matter of law by rendering judgment in favor of the moving or non-moving party."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 537 (1995).

On appeal, plaintiff argues: 1) the trial court failed to impute Kathy's knowledge of plaintiff's desired flood insurance coverage to defendants; 2) a genuine issue of material fact exists regarding the board's desire to obtain maximum coverage, warranting a reversal of summary judgment; 3) the trial court erred in not finding a "special relationship" between plaintiff and defendants; and 4) the trial court erred in barring plaintiff's expert reports.

Plaintiff asserts that because Kathy was a director of the agency, she was an "on-site" agent of defendants.  Therefore, when the board conveyed to Kathy its desire for maximum flood coverage, the judge should have imputed that knowledge to defendants.  Plaintiff relies on corporate principles to support this argument, specifically N.J.S.A. 14A:3-5(1)(a).  We find that statute inapplicable to this professional negligence matter.

12

Title 14A is the statutory authority governing directors and officers of corporations in New Jersey. N.J.S.A. 14A:3-5 pertains to the indemnification of directors, officers, and employees. N.J.S.A. 14A:3-5 (1)(a) defines a corporate agent as "any person who is or was a director, officer, employee or agent of the indemnifying corporation." We are unpersuaded that a definition used in a statute governing corporate indemnification can be transferred to a professional negligence setting. See, e.g., Restatement (Third) of Agency § 1.01 cmt. f, illus. 2 (Am. Law Inst. 2006) (stating "directors are neither the shareholders' nor the corporation's agents" because their "powers originate as the legal consequence of their election and are not conferred or delegated by shareholders").

Kathy was not an employee or officer of the agency. Ed did not appoint her as an agent of the agency. See ibid. ("Fellow directors may, with that director's consent, appoint a director as an agent to act on behalf of the corporation in some respect or matter."). Plaintiff did not present any evidence to contradict Ed's statement that Kathy did not have any responsibilities, other than check signing authority, with the agency.

All of Kathy's interactions with the board were in her capacity as plaintiff's property manager. There was uncontroverted evidence that Kathy

13

conveyed the board's communications regarding flood coverage to Ed. In turn, she presented the board with Ed's letters and premium quotes for the coverage. Kathy was not an insurance broker and did not procure insurance for plaintiff. When Boyce replaced Kathy as property manager, she performed the same duties. Kathy was not defendants' agent. Therefore, if she knew plaintiff sought maximum flood insurance, her knowledge cannot be imputed to defendants.

We also are unconvinced that there remained a disputed genuine issue of material fact, specifically, whether the board requested Kathy to advise defendants it desired maximum flood coverage.

"[A] non-moving party cannot defeat a motion for summary judgment merely by pointing to <u>any</u> fact in dispute." <u>Brill</u>, 143 N.J. at 529. A party opposing the motion must offer facts that are substantial or material in order to defeat the grant of summary judgment. <u>Judson v. Peoples Bank & Tr. Co. of Westfield</u>, 17 N.J. 67, 75 (1954).

Here, the record demonstrates Ed informed Kathy by letter in August 2006 that each building was insured for $250,000 in flood insurance, and if the board wanted maximum coverage, it needed to increase its flood policies to $2.4 million per building. Ed's letter was provided to the board. In January 2007, defendants presented Kathy with a quote for $1 million coverage for each

14

building. Kathy responded to defendants' quote stating, "[p]lease increase coverage immediately as per [b]oard of [d]irectors." The 2007-2008 policy reflected coverage of $1 million per building. The property manager presented the board each year with its insurance policies for review. The board never increased its flood insurance policies to Ed's recommended amount. Conversely, Simpkins testified she recalled telling Kathy the board wanted the buildings to be "fully insured." Plaintiff contends this statement alone is sufficient to defeat summary judgment. We disagree.

It is immaterial whether the board requested Kathy to obtain full coverage. The material facts are that Kathy requested a quote for $1 million in coverage. In response to the provided quote, Kathy instructed defendants to acquire flood coverage of $1 million per building. Her note advised the increase in coverage was per the board's instructions. Therefore, Simpkins' testimony disputing what coverage the board desired is of no import to the legal determination of whether defendants breached their duty as insurance producers. It was undisputed that they were instructed to obtain coverage of $1 million per building and they complied with those instructions.

Plaintiff asks this court to hold defendants to a higher standard of care, alleging a "special relationship" due to Ed's position as president of the board

coupled with his condominium ownership. We have recognized certain limited circumstances may create a special relationship, specifically when an insurance broker assumes duties that invite the insured's detrimental reliance and trust beyond those typically associated with the agent-insured relationship. See Triarsi, 422 N.J. Super. at 116-17. See also Glezerman v. Columbian Mut. Life Ins. Co., 944 F.2d 146, 150–51 (3d Cir. 1991) (finding a special relationship when a widow asserted that she relied on broker "to tell her when, how much, and from which account to make a premium payment").

Here, plaintiff has not demonstrated any additional relationship existed between the parties other than that of a traditional agency-insured dynamic. To the contrary, in 2008, plaintiff stopped using Ed and his agency for its liability and property insurance needs. As to flood insurance, plaintiff disregarded Ed's warnings that it was underinsured and subject to co-insurance penalties. Plaintiff also failed to heed Ed's recommendations on the amount of coverage it should obtain. The argument that plaintiff relied on Ed's advice is unsupported by the record.

A-4234-17T3

We affirm the entry of summary judgment to defendants and subsequent denial of reconsideration.[3]

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] Because we conclude defendants are entitled to summary judgment as a matter of law, we need not address plaintiff's argument regarding its expert reports.

A-4234-17T3